# The Michigan Southern and Northern Indiana Railroad Co. v. John McDonough and Chauncey Andrews.

*Pleading and evidence in assumpsit: Substance of issue: Burden of proof; Variance.* Where the plaintiff in *assumpsit* relies upon the liability of the defendant, which the law implies from facts and circumstances, it is just as essential to a recovery, to prove all the facts and circumstances which create the liability alleged in the declaration, as it is where a special contract is declared on to prove the contract as alleged. And when he counts upon the common-law liability of common carriers. to carry safely, he must prove all the circumstances necessary to create the liability; and if he fail to show that the property was delivered to, and accepted by the company under cir-

THE MICH. S. & N. IND. R. R. CO. v. MCDONOUGH.

cumstances which made it their duty to assume the care and custody of the property, in its reception, transportation, and delivery, he fails to prove the contract alleged.

*Liability of railroad companies as carriers of live stock: Burden of proof: Act of 1867.* Cattle being, in their nature, much more liable to injury and loss in transportation than property generally transported by that mode of conveyance, this mode of transporting them imposes greater risks, of a different character, demanding more labor and special arrangements for their protection, and does not come within the reasons which, by the common law, imposed upon common carriers the duty of care and custody of other property, and made them insurers against loss or injury. Though the defendants, by their charter passed in 1846, were bound to take upon themselves the business of common carriers, this extended only to such property as was then usually transported by railroads as common carriers, and other kinds of property, which, in the progress of invention and improvement, might be offered for transportation, which should not impose risks of an essentially different character, nor require an essentially different mode of managing their road. The charter, therefore, did not impose the duty of carrying cattle and live stock, The company could therefore only be held liable, as *common carriers*, for the transportation of this kind of property, by special contract to that effect, or by professing or holding themselves out to the public, or to the plaintiff, as doing that kind of business in the character and with the risks of common carriers.

The burden of proof of such contract or of such holding out was upon the plaintiff; and the mere fact that defendants were in the habit of transporting this kind of property does not, of itself, raise any presumption that they had assumed the common law duties and responsibilities of common carriers of such property.

The holding themselves out to the public as doing this kind of business for all alike, on the same special terms, as to care and risks (different from those of common carriers), would not make them common carriers as to such care and risk; though, in other respects, their liability should be the same as in the case of other property generally; and their obligation to furnish proper cars and properly to make up and run their trains would be the same, and the provisions of their charter against partiality would apply.

The provisions of the act of 1867 (Sess. Laws, p. 165), which forbid railroad companies to change or limit their common-law liability as common carriers, apply only to those kinds of property which the company was, by its charter, bound to carry in that capacity, and such other kinds as they should assume thus to carry.

*Evidence: Damages.* A witness testifying as to the damage which cattle loaded upon a train of cars, at different places, had suffered in consequence of detention on the road, was asked what, in his opinion, was " the extra shrinkage of the stock at Osseo, Hillsdale, Coldwater, and Detroit, above what it would been had it gone on the regular train:"—HELD, that as the cattle had been on the train for different lengths of time, they must have been differently affected, and the question for this reason ought to have been overruled.

*M. S. & N. I. R. R. Co. Charter: Order of shipping property.* The provisions of § 5 Consolidation Act of 1855, (Laws of 1855, p. 308), which require the railroad company to carry freight from its depots and way stations in the order in which it is received, when desired by the owner, is not violated by delaying the transportation of stock awaiting shipment at a way station and ready when the train passed. but which was not ready when the train was loaded at Chicago, and which could not be taken without the employment of an extra engine, sent on at night for that purpose. The company are bound only to provide means to meet the ordinary exigencies of the business of their road,

and are not obliged, owing to a sudden and unavoidable exigency, arising from accident, to put another train upon the route.

*Heard April 9. Decided July 12.*

Error to Hillsdale Circuit.

This was an action of *assumpsit* brought by John McDonough and Chauncey Andrews, in the Circuit Court for the County of Hillsdale, against the Michigan Southern and Northern Indiana Railroad Company for damages sustained by the plaintiffs for the non-performance of a contract to carry live stock from Hillsdale, Osseo and Coldwater, to Detroit.

The plaintiffs declared specially upon the liabillty of the defendants as common carriers, and their legal obligation, as such, to carry safely one hundred head of cattle and one hundred head of hogs delivered to them for that purpose; alleging unnecessary and unreasonable delay in the transportation of the property, by reason of which delay the cattle and hogs were greatly depreciated in value, etc.

The defendants pleaded the general issue. On the trial, exceptions were taken by the counsel for the defendants to the rulings of the Circuit Judge upon the following question, propounded by the counsel for defendant to a witness called by the plaintiffs: Was it usual for shippers of cattle, and was it the custom for them, to go with the cattle on the train and care for them, under such a pass? To which question the counsel for plaintiffs objected. The Court thereupon ruled that the question might be put and answered, to which ruling the counsel for plaintiffs excepted. The witness answered and said: It was customary for some one to go with the cattle; we either went or spoke to some one to do it for us; I speak of cattle—it was not customary to do so with hogs.

Question by plaintiffs' counsel: Did you ever have any

notice, from any agent of defendant's company, that they gave you a pass in consideration of your relieving the company from any liability in carrying stock? To which question the defendant's counsel objected as being irrelevant. The Court ruled that the question was not objectionable for irrelevancy, and might be put, to which ruling the counsel for defendant excepted. In reply to this question, witness answered, No.

Question by plaintiffs' counsel: Was you ever aware, previous to shipping this stock, of any custom of defendant's company that required the shipper to go along and care for the stock, in consideration of the pass? To which question the defendant's counsel objected as irrelevant. The Court ruled that the question might be put, to which ruling the counsel of defendant excepted; and in reply to the question the witness said: I never knew of any such custom; the custom is that drovers are with their stock, and they sell when a market suits them; sometimes they are sold after loaded, to be delivered at destination.

The counsel for the plaintiffs asked the following question: What, in your opinion, was the extra shrinkage in consequence of the delay at Osseo, Hillsdale and Coldwater, and at Detroit, above what it would have been if they had gone on the regular train and had been unloaded on arrival? To which question the defendant's counsel objected, for incompetency and irrelevancy. The Court overruled the objection and permitted the question to be asked, and the counsel for the defendant excepted.

The witness is asked the same question as to the loss by shrinkage in hogs that was put in reference to the shrinkage of cattle. The defendant's counsel objects for the same reason given in reference to the first question as to cattle. The Court overrules the objection and directs

that the evidence may be received. To which the counsel for the defendant excepts.

Plaintiffs' counsel propounded the following question: If they had gone forward on the regular train on the 13th, at what time would they have arrived at Suspension Bridge? To which defendant's counsel objects, as irrelevant, as beyond our territory. The Court overruled the objection, and the counsel for defendant excepted.

The counsel for the plaintiffs asked of several witnesses the same questions as to extra shrinkage on cattle, and varying it and making it applicable to hogs. To all which questions the counsel for defendant objected, and for the same reasons stated in the objection to the former question. The Court overruled the objection and permitted the questions to be put, and defendant excepted.

The defendant's counsel put the following question, viz: Are you acquainted with the usages of other roads with which our road connects in Illinois, Indiana, Ohio and Michigan? Plaintiffs' counsel objects. The Court overruled the question and excluded it. The defendant's counsel excepted.

Defendant's counsel asked the following question: From your general knowledge of railways and length of time you have been connected with them, have you a knowledge of the general usages of the roads and connections with them east and west, and also of the Michigan Central Railroad, in reference to carrying cattle? Plaintiffs' counsel objected and the Court sustained the objection, requiring defendants to confine their inquiries exclusively to usage on their own road, and defendant's counsel excepted.

The evidence having been concluded, the counsel for defendant insisted, on behalf of said defendant, that the said several matters so produced and given in evidence, on

the part of the defendant, were sufficient to entitle the defendant to a verdict, and to be conclusive evidence in favor of the defendant to entitle it to a verdict in this case, and to bar the said plaintiffs of their action aforesaid. But to the claim of defendant's counsel in respect to their proof being sufficient to bar said plaintiffs of their action, plaintiffs' counsel objected, and insisted that the same were not sufficient to entitle the defendant to a verdict or to bar the plaintiffs of their action; and the counsel for the defendant further requested the Circuit Judge to charge the jury as follows:

I. The evidence is not admissible under the declaration, and there can be no verdict for the plaintiffs. Which charge the Court refused to give, and the defendant excepted to such refusal.

II. The usage, if proved, shows that defendant is not a common carrier of animals, and the evidence is not admissible under the declaration. Which charge the Court refused to give, but charged in lieu thereof that the defendant was a common carrier, but only according to the usage proved.

XII. That a well established, long continued usage and course of business, with which the plaintiffs have complied for years, is obligatory upon them and constitutes the rule of action between the parties, notwithstanding the plaintiffs were ignorant of the legal consequences of such usage. The Court so charged.

XIII. That the law of 1867, Session Laws of Michigan, page 165, is not applicable to defendant, because it would violate Article one, Sec. ten of the Constitution of the United States, by impairing the obligation of the contract contained in the charter of the defendant and the amendments thereto. The Court refused so to charge, and the defendant excepted to such refusal.

XIV. That if the stock which was changed at Elkhart was, in due course of business, ready for transportation at Chicago before plaintiffs' stock was ready at Coldwater, Hillsdale and Osseo, it was not a violation of defendant's charter in reference to through and way freight to continue its transportation, although such act prevented the taking on of plaintiffs' stock on the night of the 12th of December. The Court gave this charge, with this addition, viz: Unless the consequence was contemplated or reasonably expected by the company. The defendant excepted to this addition.

XIX. That it is not the duty of the defendants to send on the same engine from Elkhart which came from Chicago, or to send an extra engine at night to haul the plaintiffs' stock, but might lawfully await the arrival of the succeeding train, by which it was taken, giving the plaintiff opportunity to unload their stock, feed and rest it, if they elected. The Court refused so to charge, but charged generally the defendants were not obliged to take extraordinary pains, to which refusal and charge the defendant excepted.

XX. That all who deal with a common carrier are bound to take notice of its well established usages and course of business, and their ignorance of such usages will not prevent their application to the business transacted under it by the carrier. The Court so charged.

XXI. That if the plaintiffs have acted under the usage for years, have received passes for themselves and their servants, and under such passes have, in fact, always cared for their stock, and fed it at all yards on defendant's line, and accompanied it upon the cars, in all cases caring for it there, wholly without any interference on the part of defendant's servants there, they are bound by such course of business, and the defendant is not in such case a

carrier under the common-law liabilities. The Court so charged.

Under the charge of the Court, the jury found a verdict for the plaintiffs, and the judgment entered thereon comes into this Court by writ of error.

*Warner Wing*, for plaintiff in error.

I. The Court should have charged that there was a variance between the proof and declaration, and that the plaintiff could not recover.

We will present our views on this point under several distinct heads. We deduce this result that the declaration means, that defendant was to load, care for and watch and feed the cattle. It was to do all that a common-law carrier would be bound to do. Carriers by sea feed them; so on the lakes. But the usage showed a different obligation, and this obligation must be correctly set out whether in *assumpsit* or case. The decisions and elementary books show there is a fatal variance. It is not law that where there is a special agreement and a common-law duty, you may abandon the former and go upon the latter. Where there is an express contract none can be implied.—*Galway v. Holmes*.

(*a*) There was no evidence admissible under the declaration, and the Court should have so charged the jury.

That the admissibility of evidence is for the Court, is conceded. The only question under this head is,—Was there any open matter of fact for the jury?—*Kimball v. Rut. Co., 1854, 27 Vermont, 247*.

Let us take a plain case, where plaintiff will concede that the charge should have been as we claim. A written agreement is declared on, plaintiffs produce witnesses who prove a written contract fully embodying a *usage*. It will

be admitted that the charge would be that the contract proven was *inadmissible.* And why? Because it would not tend to prove the issue. No matter that the jury believed it. Still it would be inadmissible. If so, the Court must say so.

How is it here? No such agreement as that declared on, has been proved at all. It is not a case where the jury are to balance testimony between *two undertakings.* The plaintiffs' own witnesses, in every case, sustain the usage.

There is nowhere a distinction pointed at between a written and an oral contract. If the Court would have peremptorily excluded a writing as inadmissible, so it will the oral agreement when proven. The difference is only this:—in the latter case the testimony must be orally *delivered* before the Court sees the variance, but perceiving the variance, the Court universally exclude the evidence, and charges that the plaintiff cannot recover.

It will be said the nominal submission of a question of fact to the jury, where the matter is entirely plain, is not error, and that the remedy is a new trial, because the jury find against the evidence. Practically the result is the same in this case, but if principle is to be administered, unless the whole duty of a court is to be abandoned, and it no longer remains as law that the Judge, and not the jury, determines the admissibility of testimony, this verdict should be set aside, because the Court did not instruct the jury that the proof was inadmissible.—See *16 Mich., 332,* clear duty of Court to charge positively; *Walker v. T. & N. N. M. Co., 2 Ellis & Blackburn, 750 1853 ; York, etc., Co. v. Crisp, 16 C. B., 527, 1854; 2 Parsons on Contracts, 492 ; Neilson v. Hartford, 8 M. & W., 806, 823 ; Hinchman v. Boweler, 5 Meeson & W., 535; 2 Parsons on Contracts,*

*493;* See note citing, *20 Pick., 150; 36 Maine, Rep. 376; 1 Gray, 496.*

It is not, then, for the jury in this case to say, that upon the *facts proven* the contract was such as that described in the declaration. If there was any *conflict* in the evidence the Court might leave the jury to say, under instructions, which way the testimony preponderated. But here our argument is, that from the *invariable usage* and the presumptions of law, that the parties contracted in reference to it, and the further legal principles which show that under these usages we were carriers *sub modo* only; that first, as clearly and absolutely was the implied agreement different from that set up in the declaration, as if it were under *seal*, leaving the same terms which the law implies from these facts.

Moreover, it will not be overlooked, that in many of the numerous cases of variance we cite, the proof of a different agreement was oral. The Court charged that was a *variance*. It did not, as in this case, leave a *plain*, unquestioned fact to the jury for it in violation of duty to find against a defendant.

USAGE.—To show that the law says parties contract in reference to a usage of business. The defendant has never carried cattle, save under the usage, and it will be presumed the plaintiffs in Court below were cognizant of its terms.— *2 Redfield, 121,* cites *25 Wendell, 660; 6 Hill, 157, S. C.,* and other cases; *4 Burrows, 2300; 30 Penn., 258; 2 Redfield, 120, 122; Angell on Carriers, §§ 166, 612, 179, 357; 16 Mich., 126, 127, 128, 129, 130; Edwards on Bailment, 534.*

All who do business with a common carrier are bound to know the usages of the route. It is said that *McMillan v. South. R. R. Co., 16 Mich. Rep., 79,* decides that usage

cannot modify the liability of a carrier. It decides no such thing; but if it did, that is not what we attempt. We seek only to show a course of business different from what the declaration avers, not to modify our liability for acts which it was our duty to perform. Thus, at common law, a carrier is liable for all losses after a deviation from the direct course. Usage may show a right to run an indirect course, and thus disprove the duty averred. It would not be limiting liability for acts, but showing a right to conduct business in a particular *mode*. Quite different would be the case of attempting to show that by usage a carrier is not liable for neglectingly performing an act it was conceded he was in some mode bound to perform. But we do not deny our liability for the acts and omissions alleged, if it is shown we ever undertook to perform them. So, what defendant in error says we cannot do—limit our responsibility—we concede. We concede that the liability for acts done or *omitted* in pursuit of this course of business cannot be limited without contract either express or by an assent to a notice which makes a contract. But we now seek to prove only a course of business which shows we have never *departed* from the condition in which the common law left us. The usage is proved without any conflict.

NOT A CARRIER.—To show that the evidence of usage did in law prove that we did not assume in this instance the duties of a common carrier at common law, and consequently did not make, either expressly or impliedly, the agreement set forth in the declaration:—*McMannus v. Yorkshire, etc., Co., 4 H. & N., 327, 1859; Car v. Lancashire, etc., Co., 7 Exch., 707, 1852; McMannus v. Lancashire Co., 2 H. & N., 693, 1858; Johnson v. Midland Co., 4 Exchqr., 367, Welsby, Hurlston & Gordon, 1849; Palmer v. Grand I. R. R., 4 Mees. & Wels., 748, 1839; 2 Red. on Railways,*

*116, 117, 118.* That carriers may limit the character of goods, and no obligation to carry *otherwise* than he professes to carry. If then, we were special carriers before this law, we remain so now. We are not within the meaning of the statute prohibiting changing our common law liability. We never had any in reference to carrying cattle. We would not require feeding.—*2 Redfield, 117.* Chartered companies have same liberty of selecting, etc. See cases cited in note.—*Pardington v. South Wales Co., 38 E. L. and Equity, 432, 1856; Briddon v. G. North. Railway Co., 4 Hurlston & Norman, 847, 1858; 1st Am. Railway Cases, 182, note.* Citing many of the foregoing cases, remarks that they refer to *cattle,* and adds that in such cases, the mode of doing the business, the fact that the owner accompanies them, etc., shows there is not such a full delivery as in case of *goods.*—*Angell, § 67; A. & A., 68, note, (b.); 1 Indiana, 474; 5 Harrington 238; A. & A., §§ 77, 78, note (a); 26 Vermont, 247; A. & A., § 103.*

The test is, how have they held themselves; this measures both *right* and *liabilities.*

STATUTE.—No R. R. Company shall change its common law liability as a common carrier by any contract, or in any manner, except by contract, all of which is in writing, and none of which shall be printed, and signed by the owner or shipper. The second section about the power to deliver goods is not within the title, which is to fix the liabilities of railroad companies as *common carriers.*

If this law is constitutional, it means that the obligations cast upon a carrier, at common law, irrespective of all *contract,* local usages or notices—that of an insurer—shall be changed only by a *written instrument.* The word used is *liability,* meaning responsibility for *acts done.* It will not preclude the effects of usage as to the mode of *conducting business.* That is whether the goods shall be

carried in a particular *mode*, when and where delivered, what kind of goods, and at what rates carried. All this remains unchanged. But if goods are carried at all—which were ever the subject of carriage—the law forbids any diminution of liability in case of injury. If the liability did not exist at common law, and has never attached by defendants' *holding itself* out as subject to such liability, then it is not one within the law.

Was there at common law any such liability as *carriers of cattle*. We say, no. The reasons for such liability are eminently absurd as applied to cattle. No such traffic existed before the days of railroads, and they were carried then under the *common law liability*. It is not true that this liability must *necessarily* attach to *all things carried at all*. Perishable articles were not so at common law. They were not insured by carriers. Still he had to ventilate carefully, pack and have servants to do peculiar duties in reference to them. But defendants have no duties to perform peculiar to cattle, or any care of them whatever. Good cars and ordinary time is all. And for this should have been the declaration.—*Oxlode v. N. West Co.*, *109 Eng. Com. Law*, 681, *1864; Wise v. G. W. R. Co.*, *1 H. and N.*, 63 ; *2 Parsons on Contracts*, 241, *and note R ; Farmers' and Mechanics' Bank v. Champlain Transportation Co.*, 23 *Vermont*, 186, 206 ; *Kings v. Woodbridge*, 24 *Vermont*, 565 ; *2 Red. on Railways*, 116. A public corporation chartered as a common carrier,—no exception to this rule.—*2 Red. on Railways*, 117.

VARIANCE.—*Angell on Carriers*, § 440, *p.* 372. " The declaration must correctly state the duty or consideration for which the liability results, although the action is *ex delicto*, and a variance is as fatal as though it were *ex contractu*.—Cites *2 Greenleaf's Ev.*, § 208 ; *1 Chitty's Pl.*, 161-2, (7th edit., 125, 126. (*Angell on Carriers*, § 440 and

*441, and note (a).* After saying that under declarations for torts where they are divisible the action may be sustained, it is added that in respect to *contracts* it is different; they must be stated *correctly* or the action fails.—See form Angell on *Car., Appendix, pages 657, 658* ; 1 *Chitty's Pl., 334, 5th edition.* A trivial variation is fatal, because it is not the contract declared on, citing:—*B. N. P., 145* ; 1 *T. Rep., 240. Angell on Carriers,* § *442.* The variance is fatal if a contract in the alternative be stated absolutely, athough plaintiff has determined his option:—citing, 1 *Chitty, Pl., 309* ; *Yelv. 76, and note by Metcalf* ; 6 *Greenleaf's Rep., 109.* So if agreement to transport fifteen or twenty tons of matter, it is a fatal variance to state the contract to carry absolute twenty, although that quantity was shipped under the agreement.—*Angell on Carriers,* §§ *444, 446, 455, 456, 457, 461, 60.*

There is no alteration in the mode of declaring under the regulations in England by virtue of *4 W., 4.* This applies only to conciseness of declaration, in certain named actions on promissory notes, bills, etc.

See *Chitty's Pleadings, Ed. 1866, Appendix 738 and 743,* and same *288,* where these alterations are noticed at length. Since these rules in 1834, the judgments in reference to *declarations* are precisely what they were before ; and before these rules, certainly they showed that where there was a *special contract,* it must be declared on. The plaintiff cannot give in evidence under the declaration a contract to transport his cattle and himself, the plaintiff undertaking to go with, feed, and superintend them. This is a *different contract* from the general one set up in the narr. Plaintiff might have sustained an action if we had refused to give the *usual passes.*—*Shaw v. York, etc., Co., 13 Q. B., 347* ; *McManus v. Lancashire, etc., Co., 2 H. and N., 693* ; *Walker v. York & M. R. W., 2 E. and B.,*

*750; Palmer v. G. T. Railway, 4 Mees. & W., 748;* See *1 Am. R. W. cases, 181–2; 116 E. C. L., 1011, 1012, Peck v. Staffordshire Co., House of Lords, 1863; 8 Mees. & W., 414; 2 C. B. Rep. N. S., (7 Scott.); White v. G. W. Co., 1857; 2 B. & C., Lathom v. Rutby; 10 Com. B., 453, Austin v. Manchester, etc., Co., 1850; 13 Ad. & El., 345; Q. B., Shaw v. North W. Co., 1849; 14 Com. B., 637; Hughes v. G. W. R., 1854; 16 Adol. & E., Q. B. 600, Austin et al. v. Manchester, etc., Co., 1854; 2 Ohio, St. Rep. 131; 27 Vermont, 247; 2 Doug., Fitch & Gilbert v. Newberry; 13 Adol. & E., 348.*

II. It was error to suffer plaintiffs' witnesses to swear they were ignorant that passes were given in *consideration* of *releasing* defendant from liability in carrying cattle, and that they did not know of any usage for owners to accompany cattle in consideration of having a pass.

There was no such usage set up. We carried the *cattle*, and the *owner*, and a certain number of attendants, but we did not claim that the *pass* was eminently the *consideration* paid by us for a reduced liability. It would have been just as sensible to say that we carried the cattle in consideration of such reduction. Our undertaking is one indivisible agreement.—*3 Wallace, 107; 11 Cush., 97; Pierce on R. W., 421. 1 Ed. Smith. Rep., 140.* It is to carry the cattle, hogs, owner, and servants in a *given mode,* with certain well-understood care. The plaintiffs undertook to perform certain acts, not for us, but for themselves. They never undertook to release the defendant from any liability for not doing certain acts. It never on its part became obligated to perform them. It never held itself out as a carrier of cattle, save *sub modo.* Nothing could more mislead the jury than this irrelevant and delusive evidence in reference to their ignorance of a *custom* to release our liability *in consideration* of a *pass.* But the case is, if

possible, plainer than this. The usage depended upon the *facts* wholly. Opinions and understandings as to legal consequences are incompetent.—See *2 Greenleaf Ev.*, § *252, C. & H. Notes.*

III. It was error to permit the several witnesses to swear to the amount of shrinkage of the stock in gross, making an aggregate of the several shipments without any discrimination between the several lots, which were treated differently.

IV. It was error to exclude the proposed testimony of Knight, Curtis, and others, of the usage of the Michigan Central Railroad Co., and that of other connecting lines, in reference to the same business. It was error to exclude proof of the usages upon other roads east and west.—*2 Greenleaf's Evidence*, § *250, p. 261 ; 8 Barbour, 369, 379.* Usual on other roads, *2 Denio, 440–1* ; *Rayman v. City of Lowell, 6 Cushing, 524 ; Noble v. Kennoway, 2 Douglas, 510 ; Duke of Somerset v. France et al., 1 Strange, 661.*

V. The Court should have charged that the law of 1867 was inapplicable to the defendants. The law, if applicable to the defendant corporation, is unconstitutional. —*2 Redfield on Railways, 482 ; Ib. on Railways 419, in note.* If power reserved may impose additional burdens.—*Pierce on Railways, 19, 20, 40 ; 6 Mich., Hale's case ;* See Redfield as to police regulations. There are some modern cases which say the former decisions have gone too far under this name.

VI. The Court should have charged that if the stock sent from Chicago by way of Elkhart to Hillsdale, and Osseo and Detroit, was ready for transportation *before* that of the plaintiffs was delivered to the defendant, that it had the right to transport the same, notwithstanding it rendered the taking of plaintiff's stock by the first train impossible. And the addition by his Honor that this was not so if

defendant's agent knew that such transportation would prevent the taking of plaintiffs' cattle, was erroneous.

It is certainly clear that at common law a carrier may carry goods in the order received. Indeed, he must do so. See cases cited by Redfield. Our charter says so. The statute authorized the consolidation with the Northern Indiana, which extended to Chicago. What, then, is our duty when we receive cattle and actually start them East, before others are delivered at way stations on the road? Clearly to *continue* the *transit.*

VII. The Judge should have charged, as contained in the 19th request, that it was not the duty of defendant to send on the same engines which come on from Chicago, or to send extra engines at night to haul the plaintiff's stock, but might lawfully wait for the succeeding train, if the first was loaded to its full capacity. It was not sufficient to leave the general question of diligence to the jury, refusing the particular request made.

We were bound to provide means for transportation only to meet the ordinary exigencies of the business.—*Red., p. 163; Charter of Company, Laws of 1846, p. 170, §§ 15 and 19; page 300, § 5, Consolidation Law 1855; Ang., 289; 20 N. Y. Rep., 234; 4 H. & N., 847.* See *1 Parsons on Contracts, 639, and note; Story on Bailment,* § *545, a.* Full to this point. *Wibert v. N. Y. & E. R. R.; 19 Barbour, 49–50; S. case 2 Kernan, 245; 2 Kernan, 99; Harmony v. Bingham, et al., 1 Vent. 190; 1 Ld. Ra., 646, 652; 14 Wendell R., 315; 2 Redfield on R. W., 164,* full. Citing *Bridden v. G. W. Railway; 28 L. B., 51; 22 L. T., 94; Ang. on C.,* § *289,* § *283, and note* (a.)*, edit. 1868; Pierce on Railways, 411; 1 Abbot's N. Y. Dig., 520; 1 Am. Railway Cases, 182–3 n.*

SHIPPER MAY ALTER DESTINATION.—The shipper may change destination at any time, and the agent of company

is competent to bind the company by receiving a countermand or new directions, to which he assents.—*2 Redfield, new ed., 113; old edit., 291.* See *18 E. L. & Eq., 555–6–7.*

TIME.—Company does not guaranty delivery in any specific time.—*Pierce on Railways, 411; Angell on C., 289, 283.* A reasonable time with reference to circumstances.— *2 Red. 163.*

*C. A. Stacy*, for defendants in error.

I. The defendants below, plaintiffs in error, are common carriers, made so—1. By statute in the charter of the company.—*Laws of 1846, p. 170, Sec. 1, 194, 186, 187, Sec. 19.* By express statute in law authorizing the consolidation of the M. S. R. R. Co. with the N. I. R. R. Co.—*Laws of 1855, pp. 300 to 303.* I call the attention of the Court particularly to *Sec. 5, p. 303.* 2. The Supreme Court has repeatedly determined that the Michigan Central and Michigan Southern Railroad Companies were common carriers.—*Mich. Cent. R. R. Co. v. Ward, 2 Mich., 538; Moore v. Mich. Cent. R. R. Co., 3 Mich., 23; American Transportation v. Moore, 5 Mich., 368; Mich. Cent. R. R. Co. v. Hale, 6 Mich., 253; 4 Keyes, N. Y., 117; Mich. S. & N. Ind. R. R. Co. v. Shurtz, 7 Mich., 515; Detroit & Milwaukee R. R. Co. v. Adams, 15 Mich., 458; McMillan v. M. S. & N. I. R. R. Co., 16 Mich., 79; Cole v. Goodwin, 19 Wend., 251; Judson v. Western R. R. Co., 6 Allen, 486; Davidson v. Graham, et al., 2 Ohio St., 131; Dorr v. N. J. S. N. Co., 1 Kernan, 485; 24 N. H., 71; F. & M. Bank v. Ch. T. Co., 23 Vt., 186; Hollister v. Nowlen, 19 Wend., 234; C. & A. R. and T. Co. v. Belknap, 21 Wend., 354; Gould et al. v. Hill et al., 2 Hill, 623; Wells v. St. Nav. Co., 2 Comstock, 204; 4 Keyes, N. Y. Rep., 117.*

These authorities, as well as the decisions of our own

Courts, fully recognize the doctrine that railroad companies are common carriers, and are subject to all the duties and responsibilities of carriers at common law, and that, having accepted the benefits of their charter, which in fact gives them a monopoly of the carrying trade, they cannot divest themselves of the duties and responsibilities of a common carrier by refusing to do business, either generally or of a particular kind.

II.  Our Legislature then, by the act of 1867, steps in, and, by legislation, determines that this special contract to change or limit its common-law liability as a common carrier, can only be made in writing.—*1 Laws of 1867, p. 165.* The previous legislation in regard to railroad companies— *1 Comp. L., Sec. 1992*—and the decisions of our Supreme Court, show clearly the object of this legislation to have been, not only to prevent railroad companies, by proof of usage, or custom, or notice, from restricting or limiting their liability, but also to require the contract, if a special contract was made, to be made in such manner as to make it certain that the person dealing with the company clearly understood the terms of the contract he was making, and that he was making a special contract, which released the company from a part of the obligations which, by law, was imposed upon them.

III.  We claim, therefore, that the liability of the company is the common-law liability of a common carrier in this case, and that therefore this declaration properly sets out the plaintiffs' cause of action.

1.  At common law, in case of damages occasioned by delay when the property was actually carried and delivered to the owner, the carrier was only liable for negligence, and the contract was uniformly held to require reasonable diligence.—*1 Pars. on Con., 659; 2 Pars. on Con., 183; Parsons v. Hardy, 14 Wend., 215; Wibert et al. v. N. Y.*

& E. R. R. Co., 2 Kernan, 245, 251; Wells v. S. N. Co., 2 N. Y., Rep., 204; Hadley v. Clark, 8 Durnford & East., 259; Sisson v. C. & T. R. R., Co., 14 Mich., 489. 2. But even if the Court should hold that in this case there was a special contract, that special contract did not change the duty of the company to carry with reasonable diligence, and the damages claimed being for unreasonable delay, in our state, at least, this action was properly brought on the common-law liability.—Hawkins v. G. W. R. R. Co., 17 Mich., 57; G. W. R. R. Co. v. Hawkins, 18 Mich., 427; Throop v. N. A. Ins. Co., decided Jan., 1870.

IV. 1. The objection to the admission of the testimony of several witnesses for the plaintiff in regard to the custom or usage of the company is not well founded. The defendant had already introduced testimony tending to show that a custom or usage of the company existed not to take or transfer live stock except on certain special terms. This testimony became material, not only to show that the plaintiffs never knew or heard of such custom, and had never been informed that such custom existed, but also to disprove the existence of the custom itself.

2. Under our laws, as established by the Legislature and determined by the courts, usage, while it may control as to place and manner of reception and delivery, can never limit or restrict the obligation of the carrier to convey and deliver the property with reasonable dispatch, or release the common-law liability for damages for delay occasioned by the company or partiality of the company's employes or servants. If so, it certainly was not material to prove the custom of other companies, as that custom could not affect the rights of the parties.

Our Legislature and courts have uniformly held that duty cannot be limited or restricted by any act of the railroad company, and only by a special contract; and in

order to prevent the continued and repeated attempts of the railroad companies to avoid and shirk from the duty they owed to community, the Legislature have finally, by, the law of 1867, fixed the form in which such contract shall be made to bind the shipper or consignor.

If the first part of our argument be correct, it seems to us that it legitimately follows that the railroad company could not possibly limit or restrict their liability, either by proof of their usage, or the usage of other railroad companies.

The case in the English Court of Exchequer—*Johnson v. M. R. Co., 4 Welsby, Hurlstone & Gordon, 367*—varies from our case in the very terms of the statute. That statute permitted them to carry goods, page 368, while our statute requires the company to carry ; the one is permissive only, the other is compulsory, and the English Judges base their decision upon the fact that the statute was clearly permissive.—*Laws of 1846, p. 186, 187 ; Laws of 1855, p. 303.*

The case above cited, and a large number of English cases, have held that their railway companies are not legally bound to become common carriers, and that therefore they hold the property received as special bailees, and must be sued upon the special contract, and not as common carriers, even for a negligence or breach of duty as common carriers, if they had been sued. This position of the railway companies, as fixed by the courts and statute, differ from the one fixed, by our statute and courts, and the rights and duties of the company are changed by the change. Even in England, the Courts of Exchequer say that in case where the defendant was a common carrier the effect of a special contract, probably, would only be to exclude certain losses, leaving the carrier liable, as upon the custom of England, for the remainder.— *Wyld v. Pickford, 8 Meeson & Welsby, 443.*

The cases in this country seem generally to carry out

21 MICH.—X.

this principle, and the distinction taken by our Court
in *Hawkins v. G. W. Railway Co., 17 Mich., 57*, above
cited, that where the defendant is a common carrier, then
a special contract only changes the common-law liability
as far as it reaches, leaving the carrier bound by all his
common-law duties and responsible for all his common-law
liabilities in regard to everything not specially fixed by the
terms of the special contract, and that in case of failure
to perform any such common-law ·duty, the declaration
should be against him as a carrier, and need not set out
the terms of the special contract, is recognized by most of
the courts in this country and in England, and has, we
believe, never been really denied or overruled by any court
in either country.—*1 Am. Railway Cases, 171, and cases
there cited.*

But the counsel claim that the statute of 1867 was
unconstitutional and void, because it impaired the obligation
of the contract contained in the charter of the defendants,
and the amendments thereto. By their charter, as construed
by our courts, they were common carriers, but had the
right, by special contract with the owner of the goods to
be conveyed, to vary or limit their liability as such carrier.
The statute of 1867 does not deprive them of this right,
but simply requires that all future contracts shall be in
writing. It does not come within the principle laid down
in any of the cases, either in this state or in the United
States Supreme Court. It is not even a change of remedy.
·It is only a change in the form of contracts to be made.—
*Mundy v. Monroe, 1 Mich., 68; Cargill v. Power, 1 Mich.,
369; Bronson v. Kinzie, 1 How., 311, 2 How., 608.*

And laws which change the rule of evidence relate to
the remedy only; and while such laws may, on general
principles, be applied to existing causes of action, so, too,
it is plain that they are not precluded from such applica-

tion by this constitutional clause.—*Cooley on Const. Lim.,* 288; *Neass v. Mercer,* 15 *Barb.,* 318.

VI. The questions asked the witnesses for the defendants in error, though hypothetical, were clearly within the range of the testimony in the case, and according to the facts as claimed by us. The jury of right should determine both the amount of damage, and whether the basis on which the witnesses made their estimates, were according to the facts proved or not.

CHRISTIANCY, J.

This was an action of *assumpsit,* brought by the defendants in error, against the railroad company.

The first count of the plaintiffs' declaration alleges a contract by which the company undertook and promised the plaintiffs to take care of, and safely and securely, and without unnecessary or unreasonable delay, to carry and convey certain cattle and certain hogs, from Coldwater, in this State, to Detroit, and there safely, securely, expeditiously, and without unnecessary and unreasonable delay, to deliver the same to the plaintiffs; and alleged as a breach, substantially, that defendants did not take care of, nor safely, etc., deliver the property as aforesaid; but were guilty of such unnecessary and unreasonable delay, that the property was kept in the railroad cars for a long space of time on the route, and kept confined in the cars after their arrival at Detroit for twenty-four hours, whereby said cattle and hogs were greatly injured and depreciated in value, etc., by loss of flesh, and reduced and shrunk in weight, and one of said cattle, and a large number of the hogs died and were lost, and others of the hogs became sick and lame, and were rendered of little value.

The second count was the same in form, upon a

contract for the carrying of certain cattle and hogs from Hillsdale to Detroit, and the third count the same in form upon a contract for carrying certain cattle and hogs from Osseo to Detroit—thus, in all the counts claiming to recover upon the strict common-law liability of common carriers. The first and main question in the case is, whether there was any evidence tending to prove the contract set up in the declaration. And whether the contract be special, and expressly agreed upon by the parties, or whether it be one which the law implies from the facts and circumstances, it must, in the one case as well as in the other, be proved upon the trial, to entitle the plaintiff to recover; the only difference in this respect, being in the mode of proof; in the first case, the proof showing what was actually agreed upon; in the second, the facts and circumstances which create the duty from which the defendants' promise is implied by the law. And if the facts and circumstances shown in the latter case fail to show the particular duty alleged as the promise of the defendant, or show a different duty, and therefore a different promise, such failure or such variance will be just as fatal to the plaintiff on the trial as a failure to prove an express contract, or the proof of a different contract from that alleged.

As the plaintiffs did not seek to prove an express contract in support of their declaration, it devolved upon them to prove the delivery of the property to the company and their acceptance of it, under circumstances from which the law implies the contract declared upon; and this could only be done by showing that the company received the property as common carriers, that is to say, under circumstances which made it their duty to take care of the property in its transportation and delivery, and to protect it from all injury and loss not occasioned by the act of God or of the

public enemy—or at least, from all loss or injury which, in this mode of transporting this kind of property, might be avoided by human agency. It is unnecessary to discuss the question of proof upon any other feature of the contract alleged, since, if proved in all other respects, but not in this, the contract alleged, being an entire thing, is not proved.

For the purposes of this case it may be assumed that this company, by their charter and act of consolidation, are required to take upon themselves the business of common carriers, and to transport, as such, all such property tendered to them for that purpose as was usually transported by railroads, as common carriers, at the date of the charter of the Michigan Southern Railroad Company in 1846, and any other kinds of property which, in the progress of invention and business, might be tendered for such carriage, which should not, from its nature, impose risks of a different character, or require an essentially different mode of managing their road, or the incurring of extra expenses on *account of the different character* of such *new kinds* of property.

But the transportation of cattle and live stock by common carriers by land was unknown to the common law, when the duties and responsibilities of common carriers were fixed, making them insurers against all losses and injuries not arising from the act of God or of the public enemies. These responsibilities and duties were fixed with reference to kinds of property involving, in their transportation, much fewer risks, and of quite a different kind, from those which are incident to the transportation of live stock by railroad. Animals have wants of their own to be supplied; and this is a mode of conveyance at which, from their nature and habits, most animals instinctively revolt; and cattle especially, crowded in a dense mass, frightened

by the noise of the engine, the rattling, jolting, and frequent concussions of the cars, in their frenzy injure each other by trampling, plunging, goring, or throwing down; and frequently, on long ·routes, their strength exhausted by hunger and thirst, fatigue and fright, the weak easily fall and are trampled upon, and unless helped up, must soon die. Hogs also swelter and perish.—See *per* Parke, Baron, in *Carr v. Lancashire & Y. Railway Co.*, 7 *Exch.* 712, 713; *Denio, J. in Clarke v. Rochester & S. R. R. Co.*, 14 *N. Y.*, 573. It is a mode of transportation which, but for its necessity, would be gross cruelty and indictable as such. The risk may be greatly lessened by care and vigilance, by feeding and watering at proper intervals, by getting up those that are down, and otherwise. But this imposes a degree of care and an amount of labor so different from what is required in reference to other kinds of property, that I do not think this kind of property falls within the reasons upon which the common-law liability of common carriers was fixed. In *M'Manus v. Lancashire Railway Co.*, 2 *Hurl. & Norman*, 702, the Court say: "We are able to decide this case without referring to the second point made by the defendants, viz: the alleged distinction between the liability of carriers as to the conveyance of horses and live stock, and ordinary goods; but should the question ever arise, we think the observation which fell from Baron Parke, in *Carr v. Lancashire & York Railway Company*, is entitled to much consideration." In the same case on appeal in the Exchequer Chamber, 4 *Hurls. & Norman*, 346, *Earle, J.*, speaking of the condition of the contract in that case, says: "This condition is imposed in respect of horses. And I find neither authority nor principle for holding that defendants were bound to receive living animals, as common carriers."

In *Palmer v. Grand Junction Railway Co.*, 4 *M. & W.*,

*758*, Parke, Baron, interrupting counsel, asks: "Does the rule as to negligence apply to live animals, as horses? Of course, if they are stolen, it would; but is it so when they are delivered, although hurt or damaged? If mis-delivered the carrier would be liable; but they would not be liable for a mere accident to an animal, supposing the carriage to be safe and good and properly conducted." This case was decided in 1839, when the question was comparatively a new one. And it is quite manifest that Baron Parke, in the above remarks, had reference to the question as one of common law merely; and when he comes to decide the case (on pp. 767, 768), holding that if the company choose to carry (horses), and do not take care to accept them with a limited responsibility, then, by accept-ing them, they must be held to have accepted as common carriers, it is equally manifest that the decision is rested wholly upon the statute which he cites, expressly enumer-ating "*cattle*" with "other goods, wares, and merchandise articles, matters and things," which the company were authorized to carry, placing all apparently upon the same ground. The conclusion from the statute would seem to have been quite as broad, at least, as the premises would warrant. But it had the statute, such as it was, to rest upon. It may, however, well be doubted, whether the decision would have been the same if the question had arisen for the first time after the decision in *Oxlade v. North East. R. Co.*, *15*, *C. B.* (*N. S.*) *680*, to be hereafter noticed, and that of *Pardington v. South Wales Co.*, *38 Eng. L. & Eq.*, *432*, decided in November, 1856. In the latter case the question arose upon the reasonableness of a notice given by the company to a shipper of cattle under *17 & 18 Vict.*, *ch. 31*, § *7* (*Railway Traffic act of 1854*), which expressly held the company liable for the loss of, or injury done, to "any horses, cattle, or other animals," or to

any goods, etc., unless the conditions fixed by the notices, etc., should be held by the Court to be just and reasonable. Martin, Baron (interrupting counsel), says: "The common-law liability of common carriers does not apply to cattle at all. In former days they were not carried. They might, therefore, but for the statutes, make what conditions they pleased." Pollock, O. Baron, also says: "Why should they not say, if you insist upon our carrying your cattle, we will carry them; but it must be upon the terms that we shall not be responsible for any injury which may happen to them? They hold themselves out as carriers of horses and cattle, *sub modo*." The drovers went with the cattle, as in the present case; and Martin, Baron, in giving his judgment, says: "I doubt the liability of the company at all, even if there had been no stipulation on their part; for the fault, if any, was the fault of those who went by the train with the cattle." All the Judges held the notice reasonable.

It will be noticed that in England, by the statute cited, railroad companies are common carriers of cattle, horses, etc., and bound to carry as such, if insisted upon by the shipper, except as they may limit their liability by notices or contracts which the Court hold reasonable. And that the statute cited in *Palmer v. Grand Junction Co., 4 M. & W., 758*, was there held to have the effect to make them common carriers of such property, if they accepted it without conditions. (In that case, however, there was no evidence of their having held themselves out as doing such business *only* on special terms.) But this case has been frequently cited in this country, as if it had been made upon common-law reasons only, and applied to cases where there were no such statute as that upon which it was clearly rested by the Court. Thus (without enumerating other instances), in *Kimball v. Rutland Co., 26 Vt., 247*, the

Court, after very correctly holding that the company, by publicly offering to take cattle at one price with the common-law liability, and at another and less rate when the owner assumed the risk, thereby held themselves out and became common carriers of cattle, proceed to cite this case of *Palmer v. Grand Junction Co.* as proving the proposition that "the fact that the company have undertaken such transportation for *hire,* and for such persons *as choose to employ them,* establishes their relation as common carriers." The remark was correct enough, if applied to the facts of the case before them; but the language is much broader than is warranted by the case cited.

Upon sound principle and upon the English authorities above cited, I think it clear the transportation of cattle by railroad does not come within the reasons of the law applicable to common carriers, so far as relates to the care of the property and responsibility for its loss or injury.

Unless, therefore, there be something in the defendant's charter, or the act of consolidation, or some other statute applicable to the case,—a question I shall hereafter consider, —the company were not bound to receive or transport cattle or hogs, as common carriers, but they might legally refuse to carry them in that 'or any other capacity.

And having the right to refuse altogether, they must have the right to refuse, except upon just such terms and conditions as they saw fit to require. And these conditions might, I think, be fixed by special contract, or by notice, or by their uniform course of doing that branch of business. They might, if they chose, undoubtedly assume the position of common carriers of such property; and if they held themselves out to the public or the parties employing them as acting in that capacity, and receiving and transporting such property in that character, as they do other property, they would be bound as such, and would

21 MICH.—Y.

thereby naturally assume the custody, care, and management of the cattle from the time of their delivery at the yard or depot for transportation, the loading and unloading, and certainly the feeding and watering, when necessary, getting them up when they get down in the cars, and their protection from injuries of that and the like kind. But, to do this would obviously require them to provide yards or stables for them before put on board, with conveniences for watering and feeding, and the necessary supply of food there and at other stations, or at least at the terminus where they are unloaded,—(and their safety might sometimes require this to be done at stations along the route),—or they must provide some mode, not yet invented, for feeding and watering on the train. They must employ a corps of men skilled in the care and management of stock, a business quite foreign in its character from that of operating a railroad; and they must make many other provisions to guard against injury and risk which are not required for other property generally transported by railroads.

Now, we must shut our eyes to what is notorious to all business men; or we must take judicial notice, as I think we are bound to do, that *this is not the mode*, and such *are not the principles*, upon which this great and rapidly increasing business of transporting live stock to an eastern market is generally, if at all, done upon the railroads of *this State* (if, in fact, in any other of the Western States).—*Naylor v. Mangles, 1 Esp., 109; Spear v. Hartley, 3 Id., 81; 3 Pars. on Contr., 240; Sisson et al. v. C. & T. R. R., 14 Mich., 489.*

I think we are also bound to know that if this business were done in this mode and upon these principles, and could be done in no other way, and the railroads were to be held responsible as insurers for all damages not caused

by the act of God or the public enemies (which is strictly the common law liability), or by the viciousness of some particular animal or animals in the mass, (*Walker v. London R. R.*, cited, *Angell on Carriers*, § *214, note*), (which would be a ludicrous distinction applied to a carload of cattle), or for all such as might be prevented by human agency (*Clark v. Rochester R. R., 14 N. Y., 570*), the railroad companies, to indemnify themselves against such risks and the extraordinary expenses of this mode of doing the business, must, of course, demand a much higher freight; and if they can be compelled to carry, at all, in this way, they must provide themselves with all the conveniences I have mentioned, and keep on hand a special corps of experienced stock men; and being compelled to keep them, and having gone to the expense of the necessary conveniences, it would then be for their interest to charge the higher freight *in all cases*, and refuse to carry upon any other terms. And, in this manner, those who would prefer to take the care and risk upon themselves for a lower freight would be deprived of the opportunity.

The law of common carriers is founded mainly upon considerations of public policy, and these considerations, therefore, should not be overlooked. On the other hand, if the drover with a sufficient force of his own men, experienced in the proper management of the cattle, goes upon the same train free of charge, in a drovers' car, provided for that purpose, and has the entire charge, care and management of the cattle, and the responsibility for loss and injury incident to that mode of transportation, the company only furnishing the proper cars and motive power, and being responsible only for their sufficiency and the proper mode of making up and running the train, it is manifest there will be much less liability to

injury or loss, and that the companies can afford to carry the cattle at greatly reduced rates. This undoubtedly is substantially the mode in which this branch of business is generally carried on upon the railroads of this State, and probably other Western States, so far as relates to the transportation of cattle to an Eastern market; sometimes by special contract setting forth the terms, as in a bill of lading, receipt or ticket, and sometimes only by the uniform course of business as adopted by the company, and acted upon by their employers. But by reason of this diversity the particular terms and conditions upon which the business is actually done, in a particular case, cannot be judicially noticed without proof.

It has been frequently held, and seems to be well settled, that companies incorporated under charters which simply permit, but do not *require*, them to undertake the business of common carriers, become such, as to any particular kind of property (though such as comes within all the reasons of the law of carriers), or as to any particular portion of their route, *only* so *far as they hold themselves out as such* to the public, and are under no obligations to carry otherwise, or other kinds of property, than they publicly profess to carry.—*Oxlade v. Northwest Co., 15 C. B., (N. S.), 680; Johnson v. Midland Railway Co., 4 Exch., 367; Farmers & Mechanics' Bank v. Champlain Transportation Co., 23 Vt. 186, 206, 2 Redf. on Railways, 116.* This was so held in the first case above cited, (decided in 1864), as to the carriage of coals; notwithstanding the railway (and canal) traffic act of 1854, already cited, which clearly made the railway companies common carriers as to all kinds of property, except as qualified by notices or contracts which the Court should hold reasonable; all special contracts to be signed by the shipper, etc. And if the defendants in the present case were not bound, a

common carriers, to receive cattle and hogs for transportation, and they do not come within the reasons of the law of carriers as applied to other property, then, it must be very clear, under these authorities, that they were not common carriers of this species of property, unless, and only so far as, they professed to be and held themselves out as such. · If they have only held themselves out and professed to carry cattle on the terms, that the property should be under the care and management of the owner, or not under the care of the company, the latter merely furnishing proper cars and motive power, and being responsible only for the proper making up and running of the trains, this would not be holding themselves out as common carriers. They would, doubtless, be under the same obligations to furnish suitable cars and properly to make up and run the trains. And the duties and obligations of the company in all matters, not pertaining to the care, management and risk of the *stock*, or to the *mode* of its reception and delivery, would be the same as those which attach to them in reference to other property generally. And all the provisions of the charter against partiality in the order of receiving and shipping property would probably apply. These obligations might arise under their charter from their holding themselves out and professing to transport this kind of property on the same terms for all persons . alike, who choose to employ them. But their professing to take property for all persons applying, upon the same terms, as to custody, care and risk, would not make them common carriers in respect to such custody, care and risk, unless those terms were the same as the law applicable to common carriers, would have fixed without such terms; for this would be to hold that it would be incompetent for the company to enter into express contracts of the same kind with all persons who should choose to employ

them, if such terms should vary the common-law liability; in other words, that while each contract would be good *by itself*, *all* would be rendered *void* by showing that *all* were *alike* in these particulars.

We will next inquire whether there is anything in the charter of the Michigan Southern Railroad Company, or any other statute, making the company common carriers of this kind of · property.

By the 19th section of the charter, they are required to keep their road " in repair and open for public use for the transportation thereon of persons and property, *under such by-laws · and regulations as said company may lawfully make ;*" and they are required to have "a supply of motive power and cars both for persons and property, sufficient for the expeditious and convenient transaction of business, and transportation of all persons and property offering for transportation thereon, *according to the usual course of business upon the line and route of said road ;* and said company shall at all times receive and discharge persons and property at such warehouses and places along the line of said railroad, as such persons and · consignors may direct and require," etc.

At the time of the passage of this act, cattle had not become articles of transportation by common carriers by land in any form ' in this country; and, though they had just begun to be carried by railways in England, these did not usually take them as common carriers, but under modified liability by notice or contract, as the reports clearly show. · This charter evidently required the carriage of only such kinds of property as were then usually carried by railroads, as common carriers, and such other kinds as might, from time to time, call for transportation, the risk and care of which should fall within the like principles; and only when offered for transportation " according to the

usual course of business upon the line and route of the road," and "under such by-laws and regulations as the company might lawfully make."

By the first section of the act consolidating this company with the Northern Indiana Railroad Company (*Laws of 1855, p. 301*), "all the franchises, powers and privileges" then enjoyed by the Michigan Southern Railroad, and "all the restrictions, liabilities and obligations" imposed upon it by its charter, are to "appertain to said united corporation"—"in the same manner as if such consolidation had not taken place."

This charter of 1846 had made no express provision against favoritism, or for forwarding property in the order in which it was received, or against preferences of through freight over way freight, nor had it expressly given an action for delays in the transportation of property. Section 5 of the act of consolidation provides for these three things, and this is its *entire scope and purpose.* And though it contains the provision that the company "shall at all times, carry freight and persons, from all its depots, way stations, and other places where it is accustomed to receive or deliver such freight or persons, with all practicable dispatch, without any favoritism or partiality whatever (and as near as may be), shall forward from each of such depots, way stations, or places in the order it is received thereat, when desired by the owner thereof, all freight delivered to it for transportation;" the last clause (all freight, etc.) is qualified by the clause "when desired by the owner thereof;" meaning only that it shall not be the duty of the company to transport it in the order of its reception, unless the owner so desires; as he might wish (for instance) to bring it in, in several loads or parcels, to be sent off together, when he gets the whole ready. This provision clearly does not require the company to carry any kind of freight

which it was not already bound to carry. Such an idea is foreign to the manifest purpose of the section.

The only other statute relied upon is the act of 1867, (*Sess. Laws, p. 165*), the first section of which provides, "That no railroad company shall be permitted to change or limit its common-law liability, as a common carrier, by any contract or in any other manner, except by a written contract, none of which shall be printed, which shall be signed by the owner or shipper of the goods or property to be carried."

It must be very plain that, if this company were not, and have never become, common carriers of cattle and live stock, there was no common-law liability as a common carrier of such property which could be *changed* or *limited* by contract or otherwise; and the act can have no application to the case. It can apply only to those kinds of property which the company were bound to carry, as common carriers, and such others as they had assumed or should assume to carry in that capacity.

I proceed, then, to inquire whether there was any evidence in this case tending to show that the defendants held themselves out, or, professed to be common carriers of such property, and to assume its care and management, as such.

The burden of proving this rests upon the plaintiffs, who have alleged such a contract. And the defendants, as already shown, not being bound as common carriers, to carry cattle, and in the language of Martin, Baron, already cited, "the common-law liability of common carriers not applying to cattle at all" (unless assumed by a railroad) and such not being the mode in which cattle are generally carried by railroads in this State, (and if ever so carried, it would be an exception to the general rule)—the mere fact that the defendants were in the habit of transporting cattle raises no presumption, and gave the plaintiffs no right to

infer, that the company were transporting them in the capacity of common carriers, with all the duties and responsibilities of that character, a presumption which would very properly attach to the carrying of other property generally.

The plaintiffs must, therefore, prove affirmatively that the defendants actually held themselves out to the public as common carriers of this kind of property, or must show that they contracted to carry these particular cattle and hogs in that way. Under such circumstances I can see no principle upon which the defendants could be bound to show affirmatively any facts going to qualify their liability as common carriers, until it should be first affirmatively shown that they had become such with reference to such property. And the plaintiffs, I think, were bound to enquire and inform themselves of the usages and course of business of the company, and of the terms upon which they transported such property, and to take notice of any usage they might have adopted in reference to it.

The plaintiffs, I think, wholly failed to make the required proof. In their opening they proved that the cattle were put upon the cars and transported to Detroit, and that one of the plaintiffs and his brother went along on the same train with the cattle, having free passes given by the company (entitling them to go and return free); that it was customary for the owners or their agents to go with the cattle and to take care of them, and that they either went or got some one else to go with the cattle. And, though one of the plaintiffs testified that he did not know that the passes were given for this purpose, his brother, who went with him on this occasion, in answer to a question whether, when the cattle and hogs were shipped at Hillsdale, a free pass was given him to ride on the train in care of the stock and hogs, says: "I had. I have been accus-

21 MICH.—Z.

tomed to go over this road with cattle; always had a pass
in such cases, and did go with the cattle; there are cases
in which hogs swelter and perish, especially in hot weather."
Another witness, the father of the other plaintiff, who
attended to shipping the cattle at Coldwater, says: " I told
the freight agent I did not want any pass, as I was not
coming with the cattle." And there was no other evidence
in the plaintiffs' opening tending to show on what terms
the cattle were shipped, or in whose care or management
they were to be, except that the plaintiff, who went with
them, testifies that he left Detroit before the cattle were
unloaded, and left them in the charge of his brother.
And there was no undertaking to show that defend-
ants had ever held themselves out as common carriers
of such property. On the other hand, it was directly
and affirmatively shown on the part of defendants, by
several station agents of the company, who had been
such for years, and by the freight agents also, confirmed by
the testimony of other drovers and stock men, who had
done business on the road, that the company had never
made any provision for feeding or watering stock at any
of their depots or yards, or elsewhere, nor provided any
food for that purpose; but that, by the uniform custom of
the company, they did not, as with goods and other prop-
erty, receive or have the care of stock at the depots or
yards awaiting shipment, nor receive it at the depots or
yards at the end of the route on their road; that they had
no charge or control of it in the yards; that they never
assumed to take the charge or management of it in the
train or in course of transportation; that they never had
or employed men for any such purpose; but that the care
and management of such property was uniformly left to
the shipper and the men employed by him for that pur-
pose; that such shippers and their men received free passes

from the company, to enable them to go on the same train to take care of the cattle, get them up when they got down, and attend to the loading, unloading, feeding and watering, wherever these were to be done; that such passes were always given when wanted. Plaintiffs admit that they had done this kind of business on this road for some time, admit the custom of giving passes, and that they *do* go with *and take care of the. stock on these passes ;* but one of them who went with those cattle says he never understood the passes were given for this purpose, while the other, who, on his direct examination, had stated substantially the same thing, says on cross-examination: "When I took a pass I supposed I could go with the cattle or not, as I pleased. I did not understand, if I did go, it was at my own risk. I went with the pass to take care of the stock, to see to getting it up when it was down; feed, water and sell them." They deny that the company or its agents had told them that the stock was at their own risk. Some other witnesses on their part testify substantially the same as to the passes and what they supposed was their effect; others say nothing of the pass; while one of their witnesses, Atwater, says: "In giving passes, agents would give them to us to go in charge of the cattle, on stock trains," and Teachout and Johnson say: "When I take a pass, I understand I am to go on the train and take care of the cattle." And all the witnesses of the plaintiffs, who were examined on the point, admitted the custom of passes to go with the stock. But while the plaintiffs and some of their witnesses denied that they supposed it made any difference in the responsibility of the company, whether they went with the stock, no one of them says or pretends, nor does either of the plaintiffs, that they supposed or expected the company were to take any care of it; nor that the company ever had done or

assumed to do so, or made any provisions or employed any men for that purpose, nor that they ever complained that the company did not do so; but their whole testimony—though it is quite apparent that particular care was taken not to touch upon that point—tended to show that they did not expect the company to take the care or management of the stock on the train, nor suppose it to be the duty of the company to do so. When, therefore, they say they did not suppose, by taking the pass, they released any liability of the company—this may be true. When they say they did not understand the stock was at their own risk—they simply give an erroneous legal opinion. If they did not expect, or look to the company to take care of the stock, and whatever care it received was to be their own, and that of their own men, then it is clear they did not suppose they had contracted for the care of the stock by the company. Some of their witnesses testified that they had shipped cattle short distances on the road without going with them, but their testimony showed that they did not rely upon the company to take charge of the stock, but upon some persons employed by themselves at some station, or at the terminus of the company's road.

The plaintiffs, under objection, were allowed to show that they "did not know of any custom by which shippers undertook, in consideration of a *pass*, that they would take care of the stock on the train;" but this was not the question. This was not claimed by the defendants. Their claim was, and their testimony had tended to show, that the company did not assume the care of the cattle, whether the owner went on the pass or not—that these passes were given that they might go and take care of it, if they pleased; but that, whether they did or not, the company did not assume the care nor the risk. But it is unnecessary to discuss this evidence further; since, if the burden

of proof rested upon the defense (as I think it did not) to show that the company did not have, and that it was not understood that they should have, the care and management of the stock, in the course of transportation, this was fully and clearly shown by them upon the trial; and there was no evidence on the part of the plaintiffs controverting *this proposition.* But, on the contrary, the tendency of the whole testimony, as well of the plaintiffs as of the defendants, was to show that the stock was in the plaintiffs' own care and management, and that they did not trust to the company for, nor expect them to exercise, such care and management. They may have supposed they *could hold* the company liable as common carriers, notwithstanding. But this in no respect alters the case.—*Brind v. Dale,* *2 M. & W.,* *775.* Such an opinion would be as unsound in law as the attempt would be in morals.

But the burden of proof, as I have endeavored to show, was not upon the defendants to qualify their liability as common carriers; but upon the plaintiffs to show that such liability existed; which they could only do by showing that they had held themselves out as common carriers of this kind of property, or that they had undertaken to carry this particular property in that way. This they entirely failed to do, or to introduce any evidence tending to support, in this particular, the contract alleged in their declaration, safely and securely to carry and deliver.

Though the evidence may show *a* contract, yet, as this differs in a very essential particular from that alleged, its identity with the latter is disproved; and this (unless in a proper case an amendment is allowed upon the trial) is just as fatal to the plaintiffs' case as the failure to prove any contract whatever.

But it is urged that the conclusion is in conflict with our decision in *Great Western Railway Co. v. Hawkins, 18 Mich., 427.*

That was not like the present, an action of *assumpsit* upon contract, but an action on the case *for a tort;* and though, in such a case, a contract may be, and often is, so alleged, as the foundation of the duty, that a variance between such alleged contracts and the proof may become as fatal as in an action upon the contract itself; yet it is quite certain that no contract needed to have been stated in that case.—See "*Ang. on Car.,*" secs. *423* to *428,* and cases there cited, especially *Brotherton v. Wood, 3 Brod. & Bing., 54; Wyld v. Pickford, 8 M. & W., 490; Orange Bank v. Brown, 3 Wend., 158;* and it seemed to us equally clear that no contract, in any proper sense of the term, was stated in the declaration. The delivery of the goods was not stated to be on request, nor did it state that the defendant *undertook or promised* anything, and of course, therefore, it stated nothing as a consideration for any promise. The action was purely one of tort; and in such a case it was not supposed that any question of variance could arise, as to the identity of the contract proved, with that alleged, when, properly speaking, *none* was alleged.

It was assumed that the gist of the action being the tort, it was enough that the proof conformed substantially to the declaration, showing a violation of the duty alleged, (See *Yall v. Arnold, 2 Penn., 292; Everard v. Hopkins, 2 Buls., 333; 1 Arch. N. P., 412,*) and that no practical good would be accomplished by applying to such a case the strict rules of variance applicable to cases upon contracts.

But as the case in the *18 Mich.* was a mere deduction from, or expression of, what was involved in (and therefore to be considered as decided by) the same case as reported in the *17 Mich., 57,* when the precise question of variance, though involved, was not raised, nor (as I am informed) argued; and we could not therefore, when the case was before us the second time (after the new trial), well have

reversed the particular case upon a point which was involved in it when first decided, and which if well taken should have prevented the new trial; and as there is some confusion and perhaps conflict in the authorities upon the question of variance, I should not be disposed to consider the decision as precluding further argument, should the point again arise.

The view I have thus far taken of the present case, if correct, shows that the Court erred in refusing the first and thirteenth requests to charge (19th and 21st assignments of error), and the objections taken by first and second assignments of error upon the admission of evidence were well taken. It also renders the question raised by the seventeenth and twentieth assignments of error immaterial.

There are several other errors assigned relating to questions which may arise on a new trial, and which we proceed to notice:

A part of the cattle and hogs had been put upon the cars at Coldwater, part at Hillsdale, and part at Osseo; those at Coldwater on the evening of the 12th of December, the cattle and the hogs at Hillsdale and Osseo about the same time. But the cattle at Hillsdale seem to have been first put on, on the morning of the 13th, then taken off again and fed, and loaded again at about one o'clock P. M. of the 13th; and the cattle at Osseo were loaded about two o'clock P. M. of the 13th. The train, which took the whole, came along from the west, took those at Coldwater about two o'clock P. M. of the 13th, those at Hillsdale about dark, and those at Osseo about seven o'clock in the evening. They reached Detroit about five o'clock A. M. of the 14th, but were not unloaded until the afternoon of that day, and none (except those from Hillsdale) were fed or watered from the time they were put on the cars till they were unloaded, some of the stock thus having been much

longer on the cars than other portions of it, without food or water. A general question was allowed under objection from defendants, to be put to the witnesses and answered: "What, in their opinion, was the extra shrinkage of the stock at Osseo, Hillsdale and Coldwater, and at Detroit, above what it would have been had it gone on the regular train (which went on the morning of the 13th, but did not stop to take these cars), and had been unloaded on its arrival." It is obvious that different portions of the stock, having been on the cars without food or water for different lengths of time, must have been quite differently affected by shrinkage; and that the question should have been put and answered as to each separately. The admission of these questions was, therefore, erroneous. There were some other questions as to the admission of evidence upon which we express no opinion, as they will not be likely to arise in the same form upon a new trial.

We think the fourteenth request to charge was also erroneously refused. The testimony showed that the stock taken on at Chicago on the regular stock train, which the plaintiffs expected to take their stock as it came along, but which passed without taking it, was started at Chicago at 5 o'clock in the morning of the 12th, before any of the plaintiffs' stock was put on the cars at Coldwater, Hillsdale or Osseo, and before the testimony showed any of it to be ready for shipment. The charge asked, was upon the hypothesis that the jury might find it was impossible, under the circumstances, to take the cars with plaintiffs' cattle along on that train, and asked the Court to charge that, if the jury should find that the stock taken on at Chicago on the morning of the 12th, was, in due course of business, ready for transportation before plaintiffs' stock was ready at Coldwater, Hillsdale and Osseo, it was not a violation of the defendants' charter in reference to through and way

freight, to continue its transportation, although such act prevented the taking on of the plaintiffs' stock on that train as it came along. The Court charged this, with the following qualification, viz: "Unless the consequence was contemplated or reasonably expected by the company." I think the defendants had a right to this charge, without the qualification. The charter referred to (*Consolidation act of 1855*, § *5*, already cited) required them to ship property "in the order it was received, at their depots, way stations, and places when desired by the owners thereof," and if not desired, it could not have been, in the due course of business, ready for transportation.

The road of the defendants is a single line from Chicago east to Elkhart, which is some distance west of Coldwater. From Elkhart there are two lines east, one to Toledo, over what is called the "air line," and the other, the old line, *via* Adrian, from which last point they have one line to Toledo and one to Detroit.

While a large amount of stock was coming from Chicago to go, *via* the air line, from Elkhart to Toledo, and thence east over the Cleveland & Toledo Railroad, and a considerable amount also by the old line east from Elkhart, a dispatch was received by the Superintendent, of the breaking down of a bridge on the Cleveland & Toledo Railroad: and the owners of the stock on the cars bound for Toledo, changed the route for their stock and ordered it sent from Elkhart, *via* the old route, to Detroit. (The plaintiffs' cattle were also first ordered shipped to Toledo, but they also for the same reason changed the route to Detroit.) In consequence of this change a large amount of stock cars were suddenly and unexpectedly thrown upon the old line for Detroit. This, with the state of the weather, was the reason the stock train, upon which the plaintiffs and the station agents had expected to send the plaintiffs' stock, was not

21 MICH.—A².

taken.    They therefore had to await the next train, the engineer not thinking it possible to take it on the first. But the company had an, extra engine at Elkhart, which could have been sent on, on the night of the 12th, after the large train had passed, though the Superintendent testified it could not have got the cattle through any sooner to Detroit.

In view of these facts the defendants requested the Court to charge, that it was not the duty of the defendants " to send an extra engine at night to haul the plaintiffs' stock, but they might lawfully await the arrival of the succeeding train, by which it was taken, giving the plaintiffs opportunity to unload their stock, feed and water it, if they elected."

The Court refused so to charge, but did charge generrally " that the defendants were not obliged to take extra pains."

The company were only bound to provide means to meet the ordinary exigencies of the business of their road, and were not obliged, owing to this sudden and unavoidable exigency, to put another train upon the route.    We think the defendants were entitled to the specific charge requested.    It was correct and specially applicable to the facts of the case; and though the charge given may have embodied the same legal proposition, it was more general and less likely to be properly understood by the jury.    And the refusal of the specific charge asked was calculated to produce the impression on the minds of the jury that it was deemed incorrect and inapplicable, or that it would not have been refused.

The judgment should be reversed with costs, and a new trial awarded.

The other Justices concurred.