KANSAS PACIFIC RAILWAY CO. v. ROBERT REYNOLDS, *et al.*

1. PRO TEM. JUDGE; *Change of Venue; Statutes Construed.* When the district judge is disqualified to sit in the trial of any case, it is his duty upon the application of either party to change the place of trial to some county where such objection does not exist.

2. DAMAGES—*Measure of; Transporting Cattle; Limit of Inquiry.* Upon failure of a common carrier to deliver goods within a reasonable time and in good condition, the rule of damages is the difference between the value of the goods as delivered at the time and place of delivery, and their value at the same place at the time and in the condition they should have been delivered. And in such case the inquiry as to the values should be limited to the place of delivery.

3. VERDICTS; *Findings upon Particular Questions.* Either party has a right to a written finding upon any particular question of fact involved in the case, and a failure to agree upon any such question leaves the verdict so incomplete that the jury should be discharged and a new trial had.

4. RAILROAD COMPANY—*Common Carrier; Transporting Cattle.* A railroad company engaged in the business of transporting cattle, assumes all the responsibility of a common carrier; and it can limit such responsibility only to the same extent and by the same means as in the transportation of other property.

5. NEGLIGENCE; *Special Contract; Burden of Proof.* When the responsibility is limited by special contract the burden of proving negligence is on the shipper.

*Error from Davis District Court.*

THE firm of *Reynolds, Semour & Ferrell,* on the 8th of January, 1870, shipped 76 head of cattle by the *Kansas Pacific Railway,* at Ogden, Kansas, to be transported by said railway company to State Line, near Kansas City. The petition alleged that said cattle were worth in all $3,420 at the place of shipment, and were to be carried by the defendant from Ogden to State Line, and there delivered to the plaintiffs for reward, within a reasonable time; that by reason of the unreasonable delay, carelessness and negligence of the defendant in transporting and delivering the same, the said cattle became damaged and injured to the amount of $2,280, and demanded judgment for such sum. The answer alleged, first, a general denial; second, that the cattle were shipped by *Reynolds,* and upon a special contract releasing defendant from all liability, etc. The answer sets forth this release, as follows:

" *Release.*—In consideration of the Kansas Pacific Railway Company contracting to transport live stock, as follows: [designating the cars, and number of head of cattle in each:] consigned to L. Ashbrook & Co., St. Louis, from Ogden to State Line, at the rate $45 per car load, it is hereby agreed both for the shipper, (he being, or acting for the consignee or owner,) that the said Kansas Pacific Railway Company and its connecting lines over which the above specified stock may pass, shall be, and are hereby released from all liability for damages of whatever kind that may happen during the transit. This company do not assume to transport stock in any given time. Ogden, Kansas, Jan'y 7, 1870."

The case was tried at the November Term, 1870. The district judge having been of counsel, directed the election of a *pro tem.* judge to try the case. The railway company objected, and moved the court to order the place of trial to be changed to some other county (district,) where the objection did not exist. The court overruled said motion, and W. G. was elected *pro tem.* judge, before whom and a jury the cause was tried.

The testimony showed that the cattle were shipped on the evening of January 7th; that the train left Ogden about midnight; that from want of sufficient steam or other cause the train was unable to make time, and several delays occurred; that the train reached State Line at 9 p. m. January 8th. *Reynolds* testified that he rode on the same train; that "no feed or water was given the cattle on the way; the cattle were not unloaded immediately on arrival; we were referred to the stock-yard men, and could not find them; the cattle were unloaded in about two hours; the cattle were bruised up, hungry, skinned and shrunken up; they looked very badly; it was about 11.25 when we got them unloaded; there was no feed or water in the yard." Other facts are stated in the opinion of the court. Verdict and judgment for plaintiffs for $1,710 damages. New trial refused, and the *Railway Company* bring the case here on error.

*Edgar W. Dennis*, for plaintiff in error:

1. The court should have granted a change of place of trial: Sec. 2 of ch. 87, laws of 1870, provides that "in all cases where the judge has been of counsel in the case the court may, on application of either party, change the place of trial to some other county where such objection does not exist." In statutory construction the word "may" is never of merely permissive import, except where it is declared that a party may do certain acts or have a certain remedy, intended for his own benefit, and the law then allows him his discretion: 5 Johns. Ch., 113; 39 N. H., 435; 1 Kent's Com., 518; Sedg. on Stat. Const. Law, 438.

The section under consideration provides for the exercise of a power in the administration of public justice, and gives to either party the right to claim such exercise of it. It is therefore imperative.

2. The court erred in admitting testimony, as it did without restriction, concerning what was done to or with the cattle after their delivery to the plaintiffs at State Line; and this error was persisted in in the instructions to the jury. The measure of

damages is to be ascertained with reference to the time and place of delivery, to-wit, State Line; and if defendant was in fault, then the damages are the difference between the value of the cattle at that place and time in the condition they were when delivered and the condition they should have been if delivered in proper time and according to the terms of the contract. The court therefore erred in refusing the following instruction asked by plaintiff in error:

" 16. The value of the cattle of the plaintiffs, in St. Louis, or the price for which the same were sold in that city, furnish no criterion of damages in this cause, and all evidence touching the disposition of the cattle after the same were delivered at State Line should be disregarded by the jury."

3. The contract and release exempted the defendant from liability. The agreement that the company did not undertake to transport the stock in any given time, plainly contemplated just such a contingency as a delay caused by the engine giving out. The risk of this was assumed by the shippers. The train reached and started from Ogden on time, or nearly so. There was no negligence, so far, on the part of the company; and neither carelessness nor unskillfulness is imputed to the management of the machine. Then came the storm—as the witness Thompson describes it, " one of the most violent, sudden and severe changes of the season." The engine was affected, got behind, and lost the right of the road. This was precisely such a mishap as was intended to be guarded against by the contract.

In the absence of special agreement, there is no implied contract on the part of a railway company to deliver with punctuality: (1 C. P., 385;) *a fortiori*, where a special contract of carriage expressly provides against liability for delay, the terms of the contract control and the carrier is protected: 2 H. & N., 693. And there are numerous and just reasons why this rule should always be applied in regard to the transportation of live stock. The common law liabilities of common carriers do not apply to cattle at all; in the absence of any statute the carrier may, as to this class of property, make what

conditions he pleases: 38 Eng. Law & Eq., 433: 12 N. Y., 245; 21 Wis., 87. And see *Mich. So. & Northern Ind. R. R. Co. v. McDonough & Andrews*, recently decided by the supreme court of Michigan.

4. The court erred in refusing the seventh instruction asked by defendant, to-wit: " By law, and under the contract in evidence, the defendant did not transport the cattle in question as a common carrier." See recent Michigan case, *supra*. We take the position, in the language of that decision, " that upon sound principles and upon authority, it is clear that that the transportation of cattle by railway, does not come within the reasons of the law applicable to common carriers, so far as relates to the care of the property and responsibility for its loss or injury."

5. The court erred also on the question of negligence. It refused to charge, as asked by defendant, that, " Where carriers have restricted their liabilities by special contract and acceptance by the shipper, the burden of establishing the fact of negligence is upon the plaintiff." And it adhered to this error by charging the jury that, " *except as to negligence* the burden of proof is upon the plaintiffs." This alone must reverse the judgment: 3 Kas., 205; 10 Am. Law. Reg., 360.

6. The defendant had a right to require special findings or answers upon particular questions of fact; (§ 7, ch. 87, laws of 1870;) and the court erred in receiving their answer that they could " not agree " upon such questions, and then giving judgment upon the general verdict.

*McClure & Humphrey*, for defendant in error. No brief on file.

The opinion of the court was delivered by

BREWER, J.: A great many questions are presented by the record in this case, and in some of them we find such errors as will compel us to send the case back for another trial.

I. When the case was called for trial the regular judge declined to sit as he had been of counsel in it. Plaintiff in error then

applied to have the place of trial changed to some county
where such objection did not exist. This applica-
tion was overruled, and the election of a judge
*pro tem.* ordered and had, and the trial proceeded
with under such judge *pro tem.* Section 56 of the civil code
as amended in 1870, (Laws 1870, p. 171, § 2,) provides that—

1. Change of venue; *pro tem.* judges; Statutes construed.

"In all cases in which it shall be made to appear to the
court that a fair and impartial trial cannot be had in the county
where the suit is pending, or where the judge is interested or
has been of counsel in the case, or subject-matter thereof, or is
related to either of the parties, or is otherwise disqualified to
sit, the court may on application of either party change the
place of trial to some county where such objection does not
exist."

This is the latest expression of the legislative will on this
subject; and upon it three questions are presented. *First:*
Does the word "may," as here used, require a construction
equivalent to "must," or is it merely a term of permission,
leaving it optional and discretionary with the court to grant
the change or not? The use of the word "may" in the sense
of "must" is frequent in the law. It is not always easy to
determine in any given case whether it is used in such sense.
The rule as laid down by Chancellor Kent in *Newburg Turn-
pike Co. v. Millar*, 5 Johns. Ch., 113, is, that "the principle
to be deduced from the cases is, that whenever an act to be
done under a statute is to be done by a public officer and con-
cerns the public interests or the rights of third persons which
requires the performance of the act, then it becomes a duty on
the officer to do it." Sedgwick in his work on Stat. & Const.
Law, p. 439, says: "That no general rule can be laid down
upon the subject further than that exposition ought to be
adopted in this as in other cases, which carries into effect the
true intent and object of the legislature in the enactment."
Tried by either of the tests suggested by these eminent jurists
and it is plain that here "may" is to be construed as equiva-
lent to "must." The act to be done is one which affects
materially the rights of third parties, rights which cannot be
secured otherwise than by its performance. It is not an act

for the benefit of the court, or the judge of the court, or which affects his rights. Therefore, according to Kent, when the circumstances arise for the doing of such act it becomes a duty, not an option, nor a discretion, with the court. Again, the evident intent of the legislature requires that we here construe "may" as "must." By this statute different contingencies are presented under which a change of the place of trial may be had. One is when it appears that a fair and impartial trial cannot be had in the county where the suit is pending. Under such a condition of things as that it cannot for a moment be supposed that the legislature meant that it should be opitional with the court whether to change the place of trial. As soon as the fact appears to him, and his judgment is convinced that a fair and impartial trial cannot be had in the one county, then it becomes an unquestioned duty, made imperatively so by this statute, to transfer the case to another. Any other construction than this would be an imputation upon the legislature. But no distinction is made as to the obligation to change between the different conditions for change. The word "may" is used but once, and refers to all the different conditions. If when a fair and impartial trial connot be had, a change must be made, so equally must it be when the judge is interested or has been of counsel. *Second:* It is urged that § 4 of ch. 28, Gen. Stat., provides for the election of a judge *pro tem.* when the regular judge is interested or has been of counsel; that this section has not been repealed, and that, though the law of 1870 be a subsequent enactment, yet a fair construction, seeking to harmonize both, and to give effect to each, would leave it discretionary with the judge whether to change the place of trial, or order the election of a judge *pro tem.* The two sections are materially different, and provide for distinct contingencies. The law of 1870 operates only upon the application of one of the parties. The provisions of the general statute are vitalized by the mere disqualification of the judge. When a case is for trial, if the judge has been of counsel and neither party moves in the matter, he orders the election of a judge *pro tem.* under § 4 of ch. 28

above cited. If however either party desires, he may apply under the law of 1870, and by that is entitled to a change of the place of trial. The two acts harmonized do not vest a discretion in the judge, but grant a right to the parties. It is not left with him, but with them to decide whether to proceed under a judge *pro tem.*, or to take a transfer. The law of 1870 thus adds a condition which is not in the General Statutes. It is not harmonizing, it is legislating, to ignore this condition, and then leave to an officer the choice as to which statute he will act under, especially when such choice might materially affect the rights of a party. *Third:* It is claimed that § 20 of art. 3 of the constitution affects this question. That section reads:

" Sec. 20.—Provision shall be made by law for the selection, by the bar, of a *pro tem.* judge of the district court, when the judge is absent or otherwise unable or disqualified to sit in any case."

In pursuance of this constitutional provision § 4 of ch. 28 of the General Statutes heretofore cited was enacted. It authorizes the election of a *pro tem.* judge under the circumstances named. Now this constitutional provision can affect this question only for one of two reasons—either because it restricts the power of the legislature to dispose of a case pending in a court whose judge is disqualified to try it, or because in such a case it guarantees to a party litigant a trial in the same court before a judge *pro tem.* It is not in terms a denial of power. It does not purport to withhold or limit. Nor is it couched in the form of a grant. The act required, is an act of legislative power. It would pass to the legislature under the general grant. Without it, unless restrained by some other clause of the constitution, the legislature could do just what it has done and what it is authorized to do under this section. If therefore it neither grants power otherwise reserved, nor restricts power otherwise granted, why was it incorporated into the constitution, and what function does it perform? It is directory in its nature. It calls the attention of the legislature to a particular subject, and imposes a duty in that respect. It

emphasizes the will of the people in reference to certain legis-
lation; and being such, we know no reason for construing an
imposition of duty as a restriction of power. It may be also
that without this provision, the section of the constitution
requiring district judges to be elected by the people would
prevent the election of a judge *pro tem.* by the bar. It is not
self-operative. It gives no rights to litigants except through
legislative action. Until such action there would be no warrant
for the election of a judge *pro tem.;* and the repeal of the
law would take away any authority for such an election. How
then can it guarantee to a suitor the right to a trial before a
judge *pro tem.?* These considerations have led us to the con-
clusion that the district judge erred in refusing to change the
place of trial. We see the hardship which may result in some
cases, and think the rule ought to be as the district judge held
it to be, that the court should have a discretion whether to
change the place of trial or order the election of a judge *pro
tem.* But we must take the law as we find it. We must
ascertain and declare the legislative will as recorded, and if the
rule that body has established be a harsh one, it alone has the
power to alter it.

II. The contract alleged in the petition and proved was to
transport cattle from Ogden to State Line. It was claimed
that through delay in the transportation they had depreciated
in value; also, that through the improper and negligent hand-
ling of them by the employees of plaintiff in error

2. Measure of damages; non-delivery of goods or stock; limit of inquiry.

during their transportation they had suffered injury.
In regard to the depreciation by delay in transpor-
tation, it is not claimed that cattle were of less value
at State Line in the evening than in the morning of the 8th of
January, but that cattle are constantly shrinking in weight during
confinement and transportation in cars, and the longer the time
of carriage the greater the shrinkage. No fall of price is claimed,
but simply a diminution of quantity. If the jury found these
facts against the plaintiff in error, what then became the rule of
damages ? Unquestionably, the difference between their value
at State Line and at the time and in the condition of their

delivery, and the value they would have had at the same place if transported without delay or injury. Sedgwick, in his work on damages, p. 279, says: "Where a given place is fixed on by the parties as that for delivery, it seems to be well settled that the inquiry as to prices is limited peremptorily to that particular place." See also 2 Ark., 397; 18 Ill., 155; 8 Pick., 9; 4 Kas., 481. The learned judge who tried this case, in his instructions to the jury, recognized the correctness of this rule and gave it to them for their guidance in estimating the damages. But during the progress of the trial he permitted the defendant in error to show, over objection, what became of the cattle after they reached State Line, that they were forwarded to St. Louis, the time occupied in shipment, the manner of transportation, the disposition made of them in St. Louis, the price at which they were sold there, their value in the condition they were when they reached St. Louis, and the value of cattle in good condition at that place. Indeed, the bulk of the testimony as to prices and values had reference to the St. Louis market. The only witness who testified as to the value at State Line, Stacey Seymour, one of the plaintiffs, on cross-examination declared: " I don't know what our cattle were worth at State Line, or would have brought on the 8th of January." The cattle were due at the State Line on the morning of the 8th, and reached there during the night following. In permitting this range of testimony we think the court erred. The value of the cattle at a subsequent time, and in a different market, might be affected by many considerations. Values change in proportion to the demand and supply. A few days might make material alteration. The treatment received, and the care and attention bestowed subsequent to the delivery at State Line would of course affect their condition and value. The range of inquiry would be widely extended, and the attention of the jury distracted by the multitude of questions from the material fact. The plaintiff in error could not be supposed to keep track of the cattle subsequent to their delivery, or be prepared with testimony as to the care and treatment they thereafter received. If their value three days after in the St.

Louis market was proper subject of inquiry, why not their value a week after in the city of New York, or a month after in the Liverpool market?

III. At the request of plaintiff in error the court submitted certain questions of fact to the jury, and directed a written finding thereon. Seven questions were thus submitted. To five of them the jury returned only this answer— "Unable to agree." A general verdict was also rendered. This verdict and answers the court received, and upon them rendered judgment. Under the code of 1868 it was discretionary with the court whether to require findings upon particular questions of fact when a general verdict was returned: Gen. Stat., p. 684, § 286. Under that law it might be that the court could properly receive and act upon a general verdict, even though no finding was returned upon any of the particular questions submitted. At least such seems to have been the ruling in New York. In *Moss v. Priest*, 1 Robt., 632, a case in which the jury failed to return any answers in writing to the particular questions submitted, Robertson, J., says: "Being a matter of discretion, I apprehend the court can withdraw the discretion at any time before the special finding is given, and the general verdict can be received without it. No vested right is acquired by either party to have the findings given, because the court had once so directed it." But by the amendment made in 1870 to our code, (Laws 1870, p. 173, § 7,) this which was before a discretion with the court has become a right of either party. It is made the duty of the court upon the request of either party "to instruct the jury if they shall render a general verdict to find upon particular questions of fact, to be stated in writing, and shall direct a written finding thereon." The right of a party to these special findings is absolute. It cannot be withheld by the court.* By another section of the code these special findings, if inconsistent with, control the general verdict. So it is a substantial right. It is secured only when the jury have returned written findings to

*Margin notes:* 3. Verdicts; Particular questions; special findings.

---

[* See *National Bank v. Peck*, post, 660, where this whole subject is fully discussed, and the statute construed.]

40—8TH KAS.

all the questions submitted. "Unable to agree" is no finding. The report of the jury is as incomplete without answers to the particular questions as it would be without a general verdict, excepting in this, that upon a general verdict without answers to particular questions a judgment could always be rendered disposing of all the issues, whereas upon answers to particular questions without a general verdict no judgment could be rendered disposing of all the issues, unless all the questions involved were specially submitted. In other words, findings of fact need not always embrace all the questions at issue. A verdict so incomplete should not be received as a verdict at all. If the jury cannot agree upon the particular questions, they should be discharged, and the case submitted to a new jury, precisely as though they were unable to agree upon a general verdict. But it may be said that a party might desire to have immaterial questions submitted. Then the court should not submit them. The right of a party to findings upon particular questions is only a right to findings upon questions material in the case. He cannot pass outside of those facts which are essential to and determine some portion of the claim or defense. His rights are limited by the questions at issue. True, he is not restricted to those general, elemental facts found in a special verdict, but he cannot go out of the case, nor even within the range of the testimony, and insist upon the submission of a question whose answer can in nowise affect the rights of the parties or the result of the suit. No court should permit the record to be encumbered with trivial and immaterial questions. It would be as improper to submit a question of fact not involved in the case, as to instruct upon an abstract proposition of law foreign to the issues.

IV. A special contract of shipment was proved. It provided that the company is "hereby released from all liability for damages of whatsoever kind that may happen during the transit. This company do not assume to transport stock in any given time." Upon this contract hinges this case. It was claimed by the plaintiff in error that as to these cattle it was not a common carrier—that

**4. Common carriers; Railroads: transporting cattle.**

it could make any conditions of shipment it saw fit; that the contract as signed stated the full measure of obligation it assumed, and hence that it was not liable for any supposed injuries, whether caused by negligence or delay, in transportation. Counsel for plaintiff in error says in his brief, using the language of Judge Christiancy in the case of the *Mich. S. & North. Ind. R. R. Co. v. McDonough & Andrews:* "The company were not bound to receive or transport cattle or hogs as common carriers, and subject to the liabilities attached to that character; but they might legally refuse to convey them in that or any other capacity. And having the right to refuse altogether, they must have the right to refuse except upon such terms and conditions as they saw fit to require; and these conditions might, I think, be fixed by special contract, or by notice, or by their uniform course of doing that branch of business." That the questions involved herein are of vital importance in this state is obvious. The immense and constantly increasing transportation of cattle from the states and territories south and west of us over the railways of this state, our extensive prairies and plains with nutritious grasses and ample pasture foreshadowing in the future stock-raising as the main business of the farmer, combine to give to these matters paramount interest. Upon the trial the presiding judge refused instructions asked by plaintiff in error embodying the claims above presented, and in lieu thereof laid down the law thus:

"It will be advisable for you first to determine whether the railway company was a common carrier; and I instruct you that a common carrier is one who undertakes for reward to transport the chattels of such as choose to employ him for that purpose; and if this company, at the time when they received the cattle in question, were in the habit of transporting the cattle of such parties as applied to them for such services, I instruct you that they are to be regarded as common carriers of cattle at that time. * * * From all the evidence touching the question you will determine whether you are reasonably satisfied that the company were common carriers of cattle. If you find that they were common carriers of cattle, I instruct you, that since there is no charge of misfeasance or malfeasance, the defendant is exonerated by the writing, which styles itself

a release, from all liability for any damages arising from any causes except such, if any, as arose from their own negligence; and I further instruct you that they are liable for any and all damages accruing from their own negligence, if any such you find.

"If you believe from the evidence that one of the plaintiffs, with a servant under his control and direction, assumed the care and management of the cattle while in the cars, the defendant is not liable for any damage which such plaintiff and servant could have prevented by reasonable care and exertion, although the same may have occurred from defendant's negligence.

"If you believe from the evidence that it was the duty of the defendant to unload, or to provide feed and water for the cattle at State Line, the defendant is liable for any damage that may have occurred from any unreasonable delay in providing them, after their arrival, or unloading, as the case may be; and you will judge whether the evidence reasonably satisfies you that the train arrived about 9 o'clock P. M.; that the cattle remained until 11 o'clock, in the cars; that forage was obtained at 12 o'clock, and water about 1 o'clock, as testified by Williams; and it is immaterial whether the company kept its own supplies of those articles, and their own servants for their disposition, or whether they relied upon other parties to furnish them, under their patronage. You are to consider what Tompkins, and other witnesses, say about the practice and necessity of feeding and watering at that place.

"The defendant is liable for any damage suffered by the plaintiffs by reason of any negligence of defendant in the hauling and conduct of the train on which the cattle were carried, as well as for negligence in providing necessary wayside conveniences."

Did the plaintiff in error act in the capacity of a common carrier in the transportation of these cattle, or was it entitled to the instruction refused, " that it did not transport the cattle in question as a common carrier?" It transported them either as a common or a private carrier. Two vital distinctions in the measure of duty and responsibility incurred by carriers are these: The common carrier must carry for all who choose to employ him. The private can accept the goods of one and refuse those of another. The common carrier insures against all loss save that caused by the act of God, or the public enemy. The private carrier is responsible only for ordinary care.

Hence, whether the company was a common or private carrier is obviously vital. An idea seems to be obtaining in some directions that so far as regards the transportation of live stock railroad companies are not common carriers. This is countenanced by the *dicta* of several judges, and by some decisions. To this doctrine we cannot give our assent. It seems to us that whenever and in so far as they assume to transport property they do so as common carriers. The sole purpose for which railroads are built is transportation. The only legitimate business in which they can engage is transportation. They perform a public duty, are engaged in a public employment, and subserve a public use so far, that, as established by the decisions of this court as well as those of the highest courts of many other states, taxation of the community in aid of their construction can be sustained. Above all other carriers are they dignified by judicial decisions as public agencies. Alone of carriers have they obtained public assistance. It is with ill grace then that they seek to avoid the responsibility which is assumed by all others who engage in the business of transportation. Receiving funds of the public to aid in construction, and then claiming to be simply private carriers in transporting for that public, presents an unseemly contradiction. Tried by all the definitions in the text-books and approved decisions, railroad companies are common carriers in reference to all property they assume to carry. Chief Justice Parker in *Dwight v. Brewster*, 1 Pick., 50, defined a common carrier to be "one who undertakes for hire to transport the goods of such as choose to employ him from place to place." Edwards in his work on Bailments says: "To constitute him a common carrier he must be one who as a regular business, undertakes for hire or reward to transport the goods of such as choose to employ him, from place to place." Story says "he must undertake to carry goods for persons generally; and he must hold himself out as ready to engage in the transportation of goods for hire, as a business, and not as a casual occupation *pro hac vice*." To the same effect are the definitions given by Angell, Kent, Bouvier, and others. Can anything be plainer than that within

the scope of these definitions a railroad company is a common carrier? Transportation is its business, not a casual occupation. How frequently has it been mulcted in damages for refusing to receive and transport passengers upon equal terms? This could never be sustained if it was only a private carrier. As a common carrier it is entitled to all the privileges, and subject to all the conditions and obligations which belong to such employment. Among these is this: One may be a common carrier in reference to certain classes of goods without being under any obligation to transport a different class. He is not under obligations to transport such goods as his vehicles are not suitable to carry. A light express wagon employed as a business in carrying small parcels from one part of a city to another, is engaged in the business of a common carrier; yet no obligation rests upon the proprietor to carry in it a piano or other heavy bulky article, whose size and weight would endanger his vehicle; nor is he under obligation to provide vehicles suitable for the transportation of such goods. It is enough if he receives and carriers such goods as are suitable for his vehicles. As Baron Parke said in *Carr v. The Lancashire & Yorkshire Rly. Co.*, 7 Excheq., 711: "Most certainly every common carrier is bound only to carry the goods of that description which the public calling requires him to carry. That is established by the case of *Johnson v. The Midland Rly. Co.*, 4 Excheq., 367." See also Judge Denio, in *Wilbert v. N. Y. & Erie R. R. Co.*, 12 N. Y., 245: "A carrier may lawfully refuse to receive goods offered for transportation, because his coach is full, or because he has not the means of transporting such goods: *Morse v. Slue*, 1 Vent., 190–238; *Lane v. Cotten*, 1 Ld. Raymond, 646, 652; Story on Bailments, § 508." By this rule railroad companies, like other common carriers, unless restricted by some requirement of their charter, or the statutes, not having vehicles suitable for, nor holding themselves out as engaged in the business of carrying cattle, may lawfully refuse to transport them. But this is a qualification incident to the business, common to all carriers and not limited to any particular species of property.

It is claimed there is a difference between live stock and other property as to the responsibility assumed by a carrier in its transportation; that the voluntary motion of the stock introduces an element of danger into the transportation against which neither reason nor authority require that the carrier insure; that inasmuch as it is customary that the shipper, or some one for him, accompany the stock, there is only a qualified or partial delivery to the carrier; and also, that proof that a railroad company has suitable cars and is engaged in the business of carrying cattle is not proof that it is a common carrier as to such cattle, because to insure their safe transportation requires yards and stables, with conveniences for feeding, both at the termini and along the route, as well as a corps of experienced stockmen to take care of them in the transit. These last as it seems to us are duties incident to the employment, and not elements to determine its character. Engaging in the business of transporting cattle, it becomes a duty to provide every suitable facility therefor. Not the manner of doing the work, but the fact of engaging in the business, is the test laid down in the books for determining the character of the carrier. A proper system of brakes is necessary on every passenger train to insure the safety of those on board. Is it not enough to show that a railroad company has passenger coaches, and is engaged in the business of carrying passengers, to establish its character as a common carrier? Must it also be shown that the train is provided with a proper system of brakes, and all the other requisites of safety? Would proof that these were wanting diminish the responsibility of the carrier? Will failure of duty lessen the obligation? If we were to take judicial notice of the fact that the shipper or some one for him goes with the stock to take care of it during transportation, we should also be compelled to take judicial notice that the shipment is, as in this case, by special contract. The company thus limits responsibility, and the shipper assumes more of the risk. That the voluntary motion of the stock increases the risk of transportation, is evident. But increase of risk does not diminish responsibility.

It calls for more care. There is more risk in carrying mirrors than railroad iron. The carrier's measure of obligations is the same. Petroleum, gunpowder, and nitro-glycerine, particularly the latter, are very dangerous to transport; yet if one engages in the business of carrying them, does he not assume the obligations of a common carrier. That a contract by which a shipper assumes all risk from the action of the cattle themselves, is a reasonable one, cannot be questioned. It may be that without any special contract the law ought to be so changed that such risk be assumed by the shipper; but such change must it seems to us be made by the legislature, and not by the courts. It is said that the carrier of slaves did not insure their safety, and that cattle should be placed upon the same footing as slaves. That carriers of slaves were not insurers, was, it is true, the nearly uniform ruling of courts: 2 Pet., 150; 4 McCord, 223; 4 Porter, (Ala.,) 234. It was a ruling growing out of the anomalous character of the institution, rather than logically sustained by the rules of the common law. Slaves were held to be passengers. It would hardly do to say that cattle were passengers, and that the measure of obligation in their transportation was the same. On this general subject the language of Judge Ranney in the case of *Wilson v. Hamilton*, 4 Ohio St., 722, is in point: "We have been no more fortunate in finding any sufficient support for the position that the responsibilities of a common carrier in respect to other property do not attach to the carriage of living animals. No such distinction has anywhere been recognized. The contrary is expressly laid down by the elementary authors to which I have referred, as well as in several of the cases cited; to which may be added others: Angell on Carriers, § 214; Story on Bailments, § 546; *Stewart v. Crawley*, 2 Stark, 323; *Porterfield v. Brooks*, 8 Humph., 497; *Palmer v. Grand Junction Rly.*, 4 M. & Welsby, 749. This question has within a few years, from the great numbers of domestic cattle now carried from the west to the east, by land and water, assumed a very decided importance; but we can feel no hesitation in declaring that those who undertake their transportation take upon themselves the obli-

gation to deliver them safely against all contingencies, except such as would excuse for the non-delivery of other property."

The conclusion then to which we have arrived is, that a railroad company engaging in the business of transporting cattle assumes all the responsibilities of a common carrier. It insures against all loss except that caused by the act of God, or the public enemy.* If it would relieve itself of this responsibility it must take the same steps as in the transportation of any other property. It may do this by special contract, but such contract never relieves against negligence: 26 Vt., 247.

V. The court refused the following instruction asked for by plaintiff in error:

"Where carriers have restricted their liabilities by special contract and acceptance by the shipper, the burden of establishing the fact of negligence is upon the plaintiff."

And of its own motion thus charged the jury:

"From all the circumstances, satisfy yourselves as well as you can on these points, if you award damages; and remembering that in this, as in the rest, except as to the negligence, the burden of proof is upon the plaintiffs."

This is wrong. The contrary rule was laid down in *Kallman v. The U. S. Ex. Co.*, 3 Kas., 205. In that case Judge Safford, speaking for the court, says: "But when carriers have once succeeded in restricting their liability by special contract or acceptance, where does the burden of proof rest as to the question of negligence? The authorities seem to be clear and uniform on this point, that the burden of establishing the fact of negligence is upon the plaintiff." This states the law as we understand it.

5. Negligence; special contract: burden of proof.

We have thus examined all the questions we deem likely to arise on a subsequent trial of the case. For the reasons given the judgment of the district court will be reversed, and the case remanded with instructions to sustain the application for a change of the place of trial  All the Justices concurring.

[ * In the case of *Kansas Pacific Rly. Co. v. Nichols and Kennedy*, decided in this court at the January Term, 1872, and to be reported in 9 Kas., the common-law liability of railway companies as common carriers is discussed at length, and somewhat in reply to the argument of the Michigan cases deciding against such liability. The supreme court of Kansas there, as here, affirms such liability.—REPORTER.]