HEARD APRIL TERM, 1877.

## BAMBERG *vs.* SOUTH CAROLINA RAILROAD COMPANY.

Where a request to charge involves the determination by the Court of a disputed question of fact, which it is the province of the jury to decide, it is not error to deny it.

In an action against a common carrier, a request by the defendant to charge "that the facts disprove negligence on the part of the defendant:" *Held,* To have been properly denied. 1st, because it undertook to decide a question of fact; and, 2d, because the defendant was liable, as at common law no question of negligence was involved.

Questions of negligence, though mixed questions of law and fact, are for the jury to decide, under proper instructions from the Court.

The common law liability of a carrier for delivery of live animals is the same as that for the delivery of inanimate things, with this exception to the rule, as generally stated, that he is not liable for injuries caused by the peculiar character and propensities of the animals.

In an action against a common carrier for goods injured or lost, the jury cannot, where no counter claim for the freight has been made, deduct the amount of the freight from the damages to which the plaintiff may be entitled.

### BEFORE MAHER, J., AT BARNWELL, JANUARY, 1876.

This was an action by F. M. Bamberg *vs.* The South Carolina Railroad Company, to recover damages for an injury to a mare of the plaintiff's, which the defendants had transported for the plaintiff from Augusta, Ga., to Bamberg, S. C.

The action was brought before a Trial Justice, who gave judgment for the plaintiff for $46.50, and an appeal was taken to the Circuit Court. At the trial in that Court the defendant requested the Court to give certain instructions to the jury, which were denied.

The defendant excepted, and, a verdict having been found for the plaintiff for $87.50, the defendant appealed to this Court.

The brief contained the testimony, written and oral, given at the trial, but it contained no case.

The requests of the defendant are contained in the opinion of this Court, and the facts will be sufficiently understood from what is therein stated.

*Skinner,* for appellant.

*Dibble & Izlar,* contra.

July 24, 1877. The opinion of the Court was delivered by

McIVER, A. J. This was an action to recover damages from the defendant as a common carrier for injuries sustained by a horse, the

property of the plaintiff, in its transportation from Augusta, Ga., by the defendant's cars, to Bamberg, S. C. The horse in question, with a number of others, forty-two in all, was forwarded from Augusta by G. W. Conway, the agent of the plaintiff, to the plaintiff, who is a dealer in stock at Bamberg. A. W. Lewis, an assistant agent of the defendant at Augusta, was charged with the duty of superintending the loading of cars with live stock, being furnished with hands for that purpose. It appeared from a paper offered in evidence and headed "Rates of transportation on the South Carolina Railroad," that special rates for the transportation of live stock from Augusta to Bamberg had been established, whereby the charge for the transportation of a single horse, &c., was nine dollars; ten to twenty horses, each three dollars and a half; for a "car load of any of the above stock, passenger to accompany each car of stock, but one kind of stock to be put in each car, and load not to exceed 16,000 pounds, thirty dollars." This paper also contained sundry rules and stipulations, amongst which are the following: "The company will not be responsible for any damage occasioned by delays from storms, nor will they guarantee special dispatch in the transportation; nor will they hold themselves liable for damages, or as common carriers, for any article, after its arrival at its place of destination and unloaded in the company's warehouses or depots." Conway, in reply to the question as to what arrangements he made with the railroad officials for the transportation of these horses, said " that he did as usual, engage a car for their shipment," while Lewis testified that "G. W. Conway applied to him for two cars for shipment of live stock to Bamberg. The two cars were chartered to Conway at thirty dollars each and placed at his disposal for loading." The plaintiff, however, testified that "I have never, at any time, made any special arrangement with defendant or its agents in regard to the transportation of my stock. When I have had stock to ship I have always notified defendant's agents and they have the cars placed in position to receive my stock, and I have always paid the regular rates of freight. I never have chartered a car from defendant; my stock shipped on their road have always been shipped in the manner just stated, and, as I have before testified, the company has always paid me for stock injured in transportation until this instance." The horse was found to be injured when taken from the cars at Bamberg, but there was no

evidence showing the cause of the injury complained of. The defendant requested the Circuit Judge to charge the jury as follows:

1. "That the plaintiff having chartered the car in question from defendant upon a fair view of same, the liability of defendant, as a common carrier, does not attach, nor can the defendant be held liable for any amount in this action."

2. "That in this instance the defendant was only liable for the proper transportation of the cars from Augusta to Bamberg."

3. "That the facts disprove negligence on the part of the defendant."

4. "That the defendant is not liable at common law as a carrier of live stock."

5. "That if they find for the plaintiff they must deduct the freight of the two cars of stock, forty-two head, at three dollars and a half per head, from the amount so found."

All these requests were refused, to which refusal the defendant excepted, and, the jury having found a verdict for the plaintiff, we are now to determine whether any error was committed by the Circuit Judge in refusing to charge as requested. The first and second requests may properly be considered together. It is very manifest that the Circuit Judge could not have given the instructions asked for without invading the peculiar province of the jury by determining the disputed question of fact as to whether the cars were chartered by the plaintiff. And as the case is presented to us it becomes unnecessary for us to volunteer an opinion as to whether, looking at the facts in the most favorable light for the defendant, the transaction amounted to a *chartering* of the car in the proper sense of that term, or whether the plaintiff, being tendered by the printed paper offered in evidence three different rates of transportation,—one by the single horse, one by the lot of ten to twenty, and one by the car load, did not simply make his selection of the one which he regarded as most favorable. Nor is it necessary for us to determine what would be the effect upon the liability of a railroad company as a common carrier, where a shipper charters, in the proper sense of that term, one of its trains, assuming full control and management of it.

The third request is open to the same objection. For while it is true, as stated by Moses, C. J., in *Scott, Williams & Co.* vs. *Crews*, (2 S. C., 538,) that "negligence is a mixed question of law and fact," which expression, we take it, was simply designed to convey

the idea that, while it would be the duty of the Court to lay down the rules by which it is to be determined whether certain given conduct falls within the one kind of negligence or the other, it would, at the same time, be the duty of the jury to determine what facts were proved in a given case, and, applying the rules furnished by the Court to the facts thus ascertained, determine whether any negligence, and, if any, of what kind, had been proved. The very fact that it is a *mixed* question shows that the instruction asked for was properly refused, for it was asking the Court not only to perform its own duty by laying down the rules of law applicable to questions of negligence, but to go on and usurp the prerogative of the jury by determining what facts were proved in the case. This request is also open to another objection. For if the defendant, when it undertook the transportation of the horse in question, assumed the liability of a common carrier at common law, then the question for the jury to solve was not a question of negligence as in the case of an ordinary bailee, but the sole question was whether the defendant had shown that the damage sustained resulted from any one of the causes which would exempt a carrier from responsibility—the act of God, or the public enemy, or other causes hereafter to be mentioned. For the rule that, in an action against a common carrier, the *onus* is upon him to show that the damage complained of was occasioned by causes which exempt him from responsibility, and that it is not enough for him to prove that he was not guilty of any negligence, but had used the utmost care and diligence, is so well settled as to admit of no question.—*Ewart* vs. *Street*, 2 Bail., 157; *Smyrl* vs. *Niolon*, 2 Bail., 421; *Cameron* vs. *Rich*, 4 Strob., 168.

This brings us to the consideration of the question raised by the fourth request: whether the defendant is liable at common law as a carrier of live stock, or, to state the question more precisely, whether a railroad company, in the transportation of live stock, is not exempt from the operation of the common law rule by which the liability of a common carrier is tested. This question, so far as we are informed, has never before been distinctly raised in this State, though it has received consideration at the hands of the Courts of other States in this country, as well as in England, and, as we shall see, no uniform result has been reached. It is true that there are many cases in which damages have been recovered from railroad companies and from ferrymen, who have been held

to be common carriers, (*Cook* vs. *Gourdin*, 2 N. & McC., 19; *Cohen* vs. *Hames*, 1 McC., 439, and *Wilson* vs. *Hamilton*, 4 Ohio St., 422,) for injuries done to live stock in its transportation, under circumstances which indicated clearly that the Courts regarded carriers of live stock as subject to the same common law rule which governs in actions for damages to inanimate property; yet the cases in which the precise question has been distinctly raised and decided are comparatively few. There is also another class of cases in which the question has been complicated with, or made to depend upon, inquiries as to whether the common law liability of a carrier could be, or had been, limited by printed notices appended to bills of lading, or by express contract. Yet the exceptions taken do not present this case under any such aspect, and, indeed, could not well do so, as the only evidence offered which in any respect tended to show that there was any design on the part of the defendant to limit its liability was that contained in the "rules and stipulations" embraced in the printed rates, and these only asserted exemption from liability for damage occasioned by delays from storms, or from the want of special dispatch in the transportation, or for damages to any article after its arrival at its place of destination and delivery in the company's warehouses or depots; and as there was no pretense that the damage complained of in this case arose from delay by reason of a storm or from the want of special dispatch, or that it occurred after the arrival of the property alleged to have been damaged at its point of destination and after it was unloaded in the warehouses or depots of the company, there was no room for such an element in the case, and hence there is no necessity to consider the further question as to whether the contract, having been made in Georgia, could be controlled by our Act of 1864 forbidding railroad companies from limiting their common law liability by notice or by special contract. There are, however, two cases which distinctly decide that railroad companies are not liable as common carriers in the transportation of live stock.—*The Michigan Southern and Northern Indiana Railroad Company* vs. *McDonough*, 21 Mich. Rep., 165, reported also in 4 Am. Rep., 466; and the *Lake Shore and Michigan Southern Railroad Company* vs. *Perkins*, 25 Mich., 329, 12 Am. Rep., 275. While the reverse is held in the following cases: *Smith* vs. *New Haven and Northampton Railroad Company*, 12 Allen, (Mass.,) 531; *Kansas Pacific Railroad Company* vs. *Reynolds*, 8 Kan., 623; *Kansas Pacific Railroad Company*

vs. *Nichols*, 9 Kan., 235, 12 Am. Rep., 494; *Clark* vs. *Rochester and Syracuse Railroad Company*, 14 N. Y., 570; to which may be added the case of *The Great Western Railway Company* vs. *Blower*, 2 Eng. Rep., (Moak's,) 700.

In the case of the *Michigan Southern and Northern Indiana Railroad Company* vs. *McDonough*, the conclusion reached that a railroad company is not liable as a common carrier in the transportation of live animals is sought to be sustained by argument as well as by authority; but in our judgment the cases cited do not sustain such conclusion, although some remarks of some of the Judges, in those cases, may justly be regarded as pointing in that direction. Nor is the argument any more satisfactory. The learned Judge who delivered the opinion of the Court says: "For the purposes of this case, it may be assumed that this company, by their charter and act of consolidation, are required to take upon themselves the business of common carriers, and to transport, as such, all such property tendered to them, for that purpose, as was usually transported by railroads, as common carriers, at the date of the charter of the Michigan Southern Railroad Company, in 1846, and any other kind of property which, in the progress of invention and business, might be tendered for such carriage, which should not from its nature impose risks of a different character, or require an essentially different mode of managing their road, or the incurring of extra expenses on account of the different character of such new kinds of property. But the transportation of cattle and live stock, by common carriers, by land, was unknown to the common law when the duties and responsibilities of common carriers were fixed, making them insurers against all losses and injuries not arising from the act of God or of the public enemies. These responsibilities and duties were fixed with reference to kinds of property involving in their transportation much fewer risks and of quite a different kind from those which are incident to the transportation of live stock by railroad." And, after pointing out the manner in which the risks would be increased, and the necessity for the railroad company to incur additional expense to secure the safe transportation of such property, he concludes that the common law rule of liability cannot be applied to the transportation of live animals. The fault of this argument seems to us to consist in assuming that the common law rule was framed with reference to, and was applicable only to, the transportation of such articles as common carriers were in the habit of

transporting at the time such rule became a part of the law, whereas we think the true view is that this rule grew out of the *nature of the business*, and was based upon considerations of public policy by which it was thought necessary that such business should be governed. The supposed necessity for the rule grew out of the fact that the carrier was entrusted with the exclusive custody and control of the goods, it did not matter of what kind or nature, of another, for a special purpose, to wit: to be transported from one place to another. Whether a person was a common carrier or not depended solely upon whether, by his acts or declarations, he held himself out to the world as such, and not upon the kind of property that he carried. One definition, in the elementary books, of a common carrier will show that his character as such did not depend upon the kind of goods which he carried, but solely upon whether he held himself out to the world as a person who was engaged in carrying property of others; not property of a particular kind, but of any kind, from place to place for hire. Take the definition given by Kent: " Common carriers are those persons who undertake to carry goods generally, and for all people indifferently, for hire, and with or without a special agreement as to price." Or that given by Story in his work on Bailments: " One who undertakes, for hire or reward, to transport the goods of such as choose to employ him from place to place." We find here no intimation whatever that the question as to whether a person occupies the position of a common carrier depends upon the kinds of goods which he carries, but solely upon whether he is engaged in the business of carrying goods generally from one place to another for hire. Then, the moment one's character as a common carrier becomes established, the rule applicable to such business must necessarily be applied. It seems to us that the argument used in the Michigan case, carried to its legitimate results, would leave very little scope for the operation of the common law rule. For, in this age, when, by the progress of invention and discovery and the development of the natural resources of the country, many new and different kinds of articles are being constantly added to the large mass requiring transportation, such a limitation of the common law rule as that contended for would open an endless source of litigation by practically abrogating the rule which the wisdom of ages has found to be the most suitable for determining the liability of persons engaged in the transportation of the goods of others from place to place for hire. For, as each

new article was introduced, it would become necessary to inquire whether its nature was such as to increase the risks incurred in its transportation. That the common law rule had its origin in considerations of public policy springing from the nature of the business in which the carrier was engaged, unaffected by the nature of the articles handled in the conduct of such business, is apparent from the reasons given in defense of the rule against what has been supposed by some to be its undue harshness.—See Story on Bail., § 490; *Smyrl* vs. *Niolon*, 2 Bail., 422. The case of the *Lake Shore and Michigan Southern Railroad Company* vs. *Perkins* having been decided in accordance with and in fact based upon *McDonough's* case, *supra*, which we have just been considering, no extended examination of it is necessary.

It is to be observed that the decisions in these two cases are in apparent conflict with the decision in another Michigan case—*The Great Western Railway Company* vs. *Hawkins*, (18 Mich., 427,) and although an effort is made in both cases to reconcile or account for such apparent conflict, yet we must confess that the effort does not strike us as successful in either case. These Michigan decisions may possibly be accounted for by what is said of them by Valentine, J., in *The Kansas Pacific Railway Company* vs. *Nichols*, 9 Kansas, 235, 12 Amer. Rep., 496: "In Michigan, since April, 1870, railroads have not been public purposes or public uses in the sense that they are such in other States of the Union. In that State they are strictly private purposes or uses.—*People* vs. *Salem*, 20 Mich., 452, 4 Amer. Rep., 400. The Supreme Court of that State says that 'they (railroad companies) are public agents, in the same sense that the proprietors of many other kinds of private business are, and not in any other or different sense. Our policy in that respect,' says the Court, 'has changed. Railroads are no longer public works, but are private property.' Railroads in Michigan seem from that decision to be such private corporations as are described in the case of *Leavenworth & Co.* vs. *Miller*, 7 Kansas, 524. If they are such private corporations as are there described, of course they have a right to be common carriers of just such property as they choose—no more and no less. This is not so in Kansas, The railroads of Kansas are organized upon a different basis. In Kansas they are endowed with a *quasi* public as well as private character. In Kansas they are so far public that the sovereign power of eminent domain may be exercised for their benefit,

and they are so far public that other public aid may be extended to them." What is here said of railroads in Kansas is in many respects true of railroads in South Carolina. We are not inclined, therefore, to follow the decisions in these two cases from Michigan, but, on the contrary, we think the rule is correctly stated in *Smith* vs. *New Haven and Northampton Railroad Company*, (12 Allen, Mass., 531,) and is well supported by reason as well as by authority. The rule as there stated is this: " The common law liability of a carrier for the delivery of live animals is the same as that for the delivery of merchandise. To this general rule there is an *apparent* exception, supported by authority which we adopt, that the liability of the carrier does not extend to injuries caused by the peculiar character and propensities of the animals to themselves or each other." But, as the learned Judge proceeds to show, this exception is more *apparent* than *real*, for while the common law rule, as ordinarily stated, is that the carrier is liable for all losses except those occasioned by the act of God or of the public enemy, yet the principle of this exception, or, more properly speaking, addition, to the common law rule, as usually stated, has always been recognized as a part of such rule. For example: The carrier was not liable under the common law rule for the natural and ordinary decay of fruits or vegetables, for the evaporation of liquids or for any other damage caused by the inherent infirmity of the article carried. So, too, the carrier would not be liable under that rule for damages occasioned by the inherent character or propensities of the animals.— Story on Bail., §§ 492 and 576; *Clark* vs. *Rochester and Syracuse Railroad Company*, 14 N. Y., 570, and *Evans* vs. *Fitchburg Railroad Company*, 111 Mass., 142, 15 Amer. Rep., 19; *The Great Western Railway Company* vs. *Blower*, 2 Eng. Rep., (Moak's,) 700. As to the fifth request, we find nothing in the pleadings or the evidence which would warrant such a charge. The defendant set up no counter claim for freight, and perhaps if it had the reply might have been that the freight had been paid. The defendant's own evidence showed that it was not entitled to freight for forty-two head of horses at three dollars and a half per head, as claimed in this request, but, at most, to only sixty dollars, the rate for the two cars used. It may be that, under the principles established by the cases of *Ewart* vs. *Kerr*, (Rice Rep., 203,) and *Dyer* vs. *The Grand Trunk Railway Company*, (42 Vermont, 441, 1 Amer. Rep., 350,) upon proper allegations, supported by sufficient proof, the defendant,

in a case like this, might be entitled to a deduction for freight, but in the case as presented to us we see no warrant for such a charge as that asked for.

We are unable to discover any error in the refusal of the Circuit Judge to charge as requested, and the motion is, therefore, dismissed.

*Willard*, C. J., concurred.