THE ATCHISON, TOPEKA & SANTA FE RAILWAY COMPANY *et al.* v. H. W. ALLEN.

No. 14,877 (88 Pac. 966.)

SYLLABUS BY THE COURT.

1. RAILROADS—*Transportation of Live Stock—Facilities to Feed and Water.* It is incumbent upon a railway company carrying live stock to provide necessary and suitable yards and facilities for the care of stock shipped over its line, in which stock in transit may be unloaded for rest, feed and water.

2. ——— *Duty to Keep Stock-yards in Reasonably Safe Condition.* It is the duty of the railway company to keep such yards, with their approaches and walks, in a reasonably safe condition, not only for the stock placed in the yards, but also for persons who accompany the stock as caretakers and who in the performance of their duties may find it necessary to go into or through the yards.

3. ——— *Duty to Caretakers Inspecting Stock in the Yards.* While the duty of feeding and watering the stock devolves upon the company, the caretakers accompanying the stock have a right to follow and inspect them and ascertain whether they are being given proper care, and the railway company is bound to exercise reasonable care for the safety of the caretakers while engaged in such business.

4. ——— *Notice of a Defect—Presumption.* The company is not only liable for injuries sustained by such caretaker by

Railway Co. v. Allen.

reason of defects in the walks in the yards of which it had actual knowledge, but also by reason of a patent defect which had existed so long that notice of it may be reasonably inferred.

5. ———— *Notice Inferred—Special Finding Not Contrary to General Verdict.* A general verdict for plaintiff, based on testimony that defendants in the exercise of reasonable diligence should have known of a defect which caused the injury, is not overthrown by a special finding to the effect that defendants had no actual knowledge of the defect.

Error from Marion district court; OSCAR L. MOORE, judge. Opinion filed February 9, 1907. Affirmed.

*William R. Smith, Lambert & Huggins, H. S. Martin, O. J. Wood,* and *Alfred A. Scott,* for plaintiffs in error.

*W. H. Carpenter,* for defendant in error.

The opinion of the court was delivered by

JOHNSTON, C. J.: H. W. Allen shipped two car-loads of cattle from Burns, Kan., to St. Joseph, Mo., over the Atchison, Topeka & Santa Fe railway, and accompanied the cattle on the train as a caretaker. When the train reached Emporia the cattle were unloaded and placed in the stock-yards for rest and to be fed and watered. The stock-yards are adjacent to the railroad, and were then operated by Hatcher & Hatcher, under a contract with the railway company. The yards were enclosed and partitioned with fencing about five feet high, and on the top of the fence around the pens in which the Allen cattle were placed two planks were laid on crosspieces which were fastened to the posts and secured by brackets. The planks so placed were used as a walk, and also as a feed-board. Shortly before the time fixed for reloading the cattle Allen climbed upon the top of the fence and proceeded to walk around on the planks to inspect the cattle and learn if they had eaten the feed given them, and whether they needed more feed and water, and, while so walking around, one of the planks, which was rest-

ing on a decayed and defective support, gave way and he fell to the ground and was severely injured. He brought this action against the railway company to recover damages, and afterward the Hatchers, who were in the management of the stock-yards, were made defendants. The negligence charged against the defendants was in permitting the walk around the top of the pens to become and remain in a dangerous condition, in that an end of one of the crosspieces supporting the walk was rotten and had broken off, leaving no support for the plank upon which Allen stepped and from which he fell. On the trial the jury awarded Allen damages in the sum of $1750.

It is contended that the evidence did not warrant the verdict. First, it is said that after Allen had turned the cattle over to the manager of the stock-yards and given orders to feed and water them he had no further business in the yard until the cattle were reloaded; that he was not required to climb the fence or use the walk from which he fell; that there were no steps leading from the ground to the top of the fence, nor was there any invitation to use the planks as a walk; and that if inspection of the cattle in the pens was necessary for any purpose it could have been made by looking over the fence or through the cracks between the boards. There was testimony, however, that the planks placed on the top of the fence around the pens were designed and used as a walk, so that the owners and caretakers of cattle could inspect them, and from that position ascertain if they had been given sufficient feed and water, and that it would have been difficult to have seen whether there was feed in the boxes and water in the troughs without a view from the top of the pen.

It was incumbent upon the railway company to provide necessary and suitable yards and facilities for the care of stock entrusted to it for shipment, in which stock in transit might be unloaded for rest, feed and water. (*Kansas Pacific Rly. Co. v. Reynolds*, 8 Kan.

623.)    It was the duty of the company and those in charge of the stock-yards to keep such yards in a reasonably safe condition, not only for the cattle enclosed in the yards but also for the persons who accompanied the cattle and who in the exercise of their rights and duties as caretakers might find it necessary to pass about and through the yards.    The trial court rightly advised the jury that after Allen left the train and went into the yards he was not entitled to that high degree of care which is due to a passenger upon a train, but that the company was held to exercise ordinary care and prudence to see that persons who rightly visited the yards for any purpose were not injured.

Caretakers who follow cattle which have been unloaded into the yards to be fed, watered and rested are not to be regarded as mere volunteers or as trespassers. Although the yards are owned by the company, and its agents and managers are charged with the duty of feeding, watering and caring for the cattle while in the yards, the accompanying owners or caretakers have a right to follow and inspect the cattle and see that they are receiving proper care.    Allen was at least entitled to the protection and care due to a customer or patron of a business establishment.    The protection which an owner or occupant of premises should take of customers coming upon the premises in the course of business, or of other persons who come by his invitation, express or implied, was discussed in the leading English case of *Indermaur v. Dames*, L. R. 1 C. P. 274, where it was said:

"This protection does not depend upon the fact of a contract being entered into in the way of the shopkeeper's business during the stay of the customer, but upon the fact that the customer has come into the shop in pursuance of a tacit invitation given by the shopkeeper, with a view to business which concerns himself.    And, if a customer were, after buying goods, to go back to the shop in order to complain of the quality, or that the change was not right, he would be just as much

13—75 KAN.

there upon business which concerned the shopkeeper, and as much entitled to protection during this accessory visit, though it might not be for the shopkeeper's bene- fit, as during the principal visit, which was. And if, instead of going himself, the customer were to send his servant, the servant would be entitled to the same. consideration as the master.

"The class to which the customer belongs includes persons who come not as mere volunteers, or licensees, or guests, or servants, or persons whose employment is such that danger may be considered as bargained for, but who go upon business which concerns the oc- cupier, and upon his invitation, express or implied." (Page 286.)

In the case of *True v. Creamery*, 72 N. H. 154, 55 Atl. 893, it was held that a patron of a creamery who was waiting about a building in the ordinary course of the business was to be regarded as present at the invitation of the proprietor, who was bound to exercise ordinary care to protect his patron against the dangers of the place. The court approved the rule stated in volume 2 of the fifth edition of Shearman & Redfield on the Law of Negligence, section 704, as follows:

"The occupant of land is bound to use ordinary care and diligence to keep the premises in a safe condition for the access of persons who come thereon by his in- vitation, express or implied, for the transaction of busi- ness, or for any other purpose beneficial to him; or, if his premises are in any respect dangerous, he must give such visitors sufficient warning of the danger to enable them, by the use of ordinary care, to avoid it. The extent, however, of his obligation is to use ordinary care and prudence to keep his premises in such condi- tion that visitors may not be unnecessarily or unrea- sonably exposed to danger." (See, also, 21 A. & E. Encycl. of L. 471.)

Allen had business in the yards—to inspect and look after his cattle, and it was a business of common in- terest and mutual advantage to shipper and carrier. The plank walks on the fences were intended for the use of those inspecting and caring for stock placed in the yards. Allen was using the walk for that purpose when

he was injured. It is said that another and safer method of inspection would have been to have looked through the fence, or, if that was impracticable, to have gone into the pens.   It appears that a full view of the feed-boxes and water-troughs could not be had from the outside, and it can hardly be said that it would have been a safer or a better plan to have gone inside of the pens among the cattle, some of which were wild, and where the bottom of the pens was covered with filth.   An inspection from the plank walk was a common practice and a convenient method, and would have been a safe one if the walk, provided in part for the purpose, had been in good condition.   The walk was adapted to, and commonly used for, that purpose, and Allen and other caretakers of stock had a right to assume that it was in a reasonably safe condition for such use.   The company having invited him to the yards as one of its patrons, and having provided walks for his use while inspecting and caring for his cattle, assumed the obligation to keep the yards and walks in a reasonably safe condition for such use, and its failure in this respect makes it liable for the resulting injuries. (*Texas & Pacific Ry. Co. v. Hudman,* 8 Tex. Civ. App. 309, 28 S. W. 388.)

The court correctly advised the jury that the defendants would only be liable for the injuries caused by a defective walk where they had notice of its defective condition or where the defect was patent and had existed so long that notice of it might reasonably be inferred.   The responsibility is as great where the defendants in the exercise of the diligence which the law requires should have known the defect as where they had actual knowledge of it.

The next contention is that answers of the jury to certain special questions were indefinite, unsupported by testimony, and fairly interpreted compel a judgment for defendants.   The questions and answers were as follow:

"Ques.  Did the defendant railway company know of

the defect complained of before the accident in question? Ans. We do not know.

"Q. Did defendants Hatcher know of the defect complained of before the accident in question? A. We do not know."

These questions, together with a number of others, were submitted at the instance of the defendants. It is contended that under the testimony the jury should have given a definite, negative answer to each question. Interpreting those given as the equivalent of negative answers, as we may, they do not overthrow the general verdict of the jury. They are no more than findings that the defendants had no actual knowledge of the defect in the walk. The questions were, Did they know of the defect? and not whether the defect was so patent and had been so long in existence that they should have known of it. There was testimony, too, that the break in the support of the walk was an old one—one which those charged with the duty of keeping it in a safe condition should have observed and remedied. Whether the defect was so open to observation that defendants are to be charged with notice of it has been settled by the jury, and as there was testimony warranting an inference of notice or a duty to know of the defect, that element, in the absence of a special finding to the contrary, is presumed to be included in the general verdict. As was said by Mr. Justice Cunningham, in *Seeds v. Bridge Co.*, 68 Kan. 522, 75 Pac. 480:

"All the elements which go to make up a plaintiff's right of recovery are found in his favor by a general verdict for him. And before special findings will avail to overthrow the general verdict they must have determined all those elements against his right of recovery." (Syllabus.)

The broken parts of the crosspiece upon which the plank rested were presented to the jurors, and they had an opportunity to see the nature of the defect and could determine about how long it had existed and whether it was observable upon reasonable inspection by those

in charge of the yards. Aside from this, there was the testimony that one of the Hatchers, upon being informed of the fall and injury, remarked that he had been trying to get the Santa Fe to fix those planks for two or three years and that maybe they would do it now. We think the findings are not inconsistent with the general verdict, and that there is sufficient supporting testimony to uphold the verdict.

There is nothing substantial in the claim that in its instructions the court assumed the existence of disputed facts, nor in some objections made to the admissions of testimony.

Finding no prejudicial error in the record, the judgment is affirmed.

GREENE, BURCH, MASON, SMITH, PORTER, JJ., concurring.

GRAVES, J., not sitting.